# Exhibit J

# In the Matter Of:

15-cv- 7152 (JMA) (ARL)

NAFTALI AS TRUSTEES OF THE EDTOM TRUST

v.

NEW YORK DEFERRED EXCHANGE CORP., et al.

## Deposition of Friedrich Trinklein

*Wednesday, September 11, 2019*

### CONDENSED



The Little Reporting Company
330 West 38th Street
Suite 404
New York, NY 10018
tel: 646 650 5055
www.littlereporting.com

## Page 1

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
ORA NAFTALI AND RONI NAFTALI,
AS TRUSTEES OF THE EDTOM TRUST,
                              Civil Action No.
              Plaintiffs,         15-cv-7152
         - v -                    (JMA)(ARL)
NEW YORK DEFERRED EXCHANGE
CORP., AND JEFFREY WECHSLER

              Defendants.
--------------------------------------X
NEW YORK DEFERRED EXCHANGE CORP.,

     Counterclaim Plaintiff,

         - v -

ORA NAFTALI AND RONI NAFTALI, AS
TRUSTEES OF THE EDTOM TRUST,
     Counterclaim Defendants.
--------------------------------------X
NEW YORK DEFERRED EXCHANGE CORP.,
     Third-Party Plaintiff,
         - v -
ORA NAFTALI AND RONI NAFTALI,
     Third-Party Defendants.
--------------------------------------X

                    September 11, 2019
                    10:32 a.m.

     DEPOSITION OF FRIEDRICH TRINKLEIN

Reported by:
Elizabeth Santamaria
```

## Page 2

```
                                           2
--------------------------------------X
ORA NAFTALI AND RONI NAFTALI,
    Third-Party Counterclaim Plaintiffs,
         - v -
NEW YORK DEFERRED EXCHANGE CORP.,
    Third-Party Counterclaim Defendants.
--------------------------------------X
ORA NAFTALI AND RONI NAFTALI,
    Third-Party Cross-Claim Plaintiffs,
         - v -
JEFFREY L. WECHSLER,
    Third-Party Cross-Claim Defendant.
--------------------------------------X
JEFFREY L. WECHSLER,

    Third-Party Plaintiff,
         - v -
JOSEPH TAPLITZKY,
    Third-Party Defendant.
--------------------------------------X

               September 11, 2019
               10:32 a.m.

        Deposition of FRIEDRICH TRINKLEIN,
pursuant to Order, at the offices of Hinshaw &
Culbertson LLP, 800 Third Avenue, New York,
New York, before Elizabeth Santamaria, a
Reporter and Notary Public of the State of
```

## Page 3

```
                                           3
A P P E A R A N C E S:

KISHNER MILLER HIMES P.C.
Attorneys for Plaintiffs/Counterclaim
Defendants
Ora Naftali and Roni Naftali
    40 Fulton Street - 12th Floor
    New York, New York
BY:  JONATHAN COHEN, ESQ.
     (212)585-3425
Email:  Jcohen@kishnerlegal.com

MILBER MAKRIS PLOUSADIS & SEIDEN, LLP
Attorneys for Third-Party Cross-Claim
Defendant
Jeffrey L. Wechsler
    1000 Woodbury Road - Suite 402
    Woodbury, New York 11797
BY:  JOHN ANTHONY LENTINELLO, ESQ.
     (516) 712-4000
Email: Jlentinello@milbermakris.com
```

## Page 4

```
                                           4
A P P E A R A N C E S (c o n t'd):

HINSHAW & CULBERTSON LLP
Attorneys for Defendants and Counterclaim
Plaintiff/Third-Party Plaintiff/Third-Party
Counterclaim Defendant New York Deferred
Exchange Corp.
    800 Third Avenue - 13th Floor
    New York, New York 10022
BY:  MATTHEW C. FERLAZZO, ESQ.
     SUZANNE WALSH, ESQ.
     (212) 471-6200
Email:  Mferlazzo@hinshawlaw.com
Email:  Swalsh@hinshawlaw.com

ORLOFF LOWENBACH STIFELMAN & SIEGEL, PA
Attorneys for Third-Party Defendant
Joseph Taplitzky
    44 Whippany Road - Suite 100
    Morristown, New Jersey 07960
BY:  XIAO SUN, ESQ.
     (973) 507-2417
Email: xs@olss.com

ALSO PRESENT:  EVAN NETALIOS, ESQ.
```

1 (Pages 1 to 4)

## Page 5

\*\*\*

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

\*\*\*

## Page 6

F. Trinklein

FRIEDRICH TRINKLEIN, having been first duly sworn according to law by the Officer, testifies as follows:

EXAMINATION BY
MR. COHEN:

Q. Please state your name and business address for the record.
A. Friedrich Trinklein, 6800 Route 25, Suite 120 W, Syosset, New York, New York 11791.
Q. Good morning, Mr. Trinklein.
A. Good morning.
Q. I --
A. What is your name again?
Q. Jonathan Cohen.
A. Nice to meet you, Jonathan.
Q. Likewise.
   I represent the plaintiffs in this matter. Thank you for taking your time out of your busy schedule to come and sit with us today to answer some questions.
A. You're welcome.
Q. I greatly appreciate it.
   MR. COHEN: I just would like to

## Page 7

F. Trinklein

note for the record that Mr. Evan Netalios. Who has acted as attorney for NYDEC in various capacities, is present here today. My understanding, he's not defending this deposition. He has not made a notice of appearance, either himself or the firm, but he is present and I was only informed of this this morning.

MR. FERLAZZO: That is correct. I am defending the deposition, Mr. Netalios is not.

Q. Mr. Trinklein, I would like to set some ground rules for our deposition to allow for an orderly exchange of questioning on my end and answers on yours. Is that okay?
A. Yes.
Q. You understand that you are under oath, correct?
A. Yes.
Q. Have you ever been arrested?
A. No.
Q. Have you ever been deposed before today?

## Page 8

F. Trinklein

A. No.
Q. If you would, when I'm asking a question, I know common conversation people think they know what the person is asking. If you would allow me to finish the question and then provide your answer, whatever it might be. This way it allows our court reporter to take down my question and your answer. Okay?
A. Okay.
Q. If you would, please only communicate verbal answers. Our court reporter cannot interpret head nods or other nonverbal cues. Okay?
A. Okay.
Q. If at any time you don't understand a question I'm asking, please let me know and I'll try and rephrase or say it differently to make sure that you understand.
   I assume if you answer my question that you do understand the question and are answering it that way. Okay?
A. Okay.
Q. Has NYDEC ever been named in a lawsuit prior to this one?

**Page 29**

1  F. Trinklein
2  yearly? How did that -- generally speaking.
3  A. Generally I think interest accrues
4  monthly. Some banks might accrue daily, but I
5  think typically it's a monthly reporting
6  process. It might be daily accruals, but
7  generally monthly would be my answer to that.
8  Q. How else does NYDEC bring in
9  revenue to the company?
10  A. Besides those two sources?
11  Q. Besides those two sources.
12  A. There isn't any.
13  Q. In your career as an employee of
14  NYDEC, how many 1031 exchanges have you
15  participated in?
16  A. I couldn't give you an accurate
17  number there.
18  Q. Generally how many do you perform
19  in a year?
20  A. Varies significantly based on
21  market conditions.
22  Q. How many did you perform in 2018?
23  A. I don't know for certain. Is a
24  range okay with you?
25  Q. Yes, range is fine.

**Page 30**

1  F. Trinklein
2  A. I would say my estimate would be
3  anywhere between I would say 50 and 150.
4  Q. If you can recall, do you remember
5  what your best year was in number of exchanges
6  handled by NYDEC?
7  A. Not accurate. Again, I could do a
8  range.
9  Q. Sure, range is fine.
10  A. The best years I would say would be
11  between 100 and 200.
12  Q. Do you recall how many -- even a
13  range is fine -- exchanges NYDEC handled in
14  2014?
15  A. No.
16  Q. For NYDEC handling the QI, you have
17  dealt with all types of real estate deals?
18  A. Many types.
19  Q. Commercial real estate deals?
20  A. Yes. They're all -- to be eligible
21  it needs to be a business property. So it
22  cannot be property held for personal use.
23  That's the one defining aspect. Otherwise, if
24  it's deeded real estate it's eligible.
25  Q. So if someone were using it as

**Page 31**

1  F. Trinklein
2  their primary residence they wouldn't qualify?
3  A. They would not qualify.
4  Q. So you could have -- but you could
5  have residential real estate?
6  A. Can be residential real estate
7  rented to others.
8  Q. Have you handled, as a QI,
9  real estate transactions involving foreign
10  persons?
11  A. No.
12  Q. Never?
13  A. To the best of my knowledge. To
14  the best of my knowledge, no.
15  At least we don't know if somebody
16  is not represented themselves as foreign, but
17  we've never had a circumstance where there's
18  been anyone at any -- there's never been a
19  circumstance that we've done an exchange where
20  we have not been provided a tax identification
21  number.
22  Q. Do you avoid handling 1031
23  exchanges for foreign persons?
24  A. If they don't have a tax
25  identification number, yes, we do not do them.

**Page 32**

1  F. Trinklein
2  That's why you may know in our agreement
3  unless the exchanger certifies that fact, that
4  they are, you know, not foreign and have a tax
5  identification number, we are unable to
6  service them. It's a complex field that we
7  are not capable of dealing with.
8  Q. What is complex about it?
9  A. If enters a -- it enters a whole --
10  Well, we have learned that
11  tangentially I guess any time you do something
12  that requires additional work, if you don't
13  know it well, you don't do it. And if I can
14  give you another example, if I may.
15  Q. Please.
16  A. Personal property exchanges. Not
17  only do you have real estate exchanges, you
18  exchange real estate for real estate. There
19  is another portion of the exchange world, the
20  property exchange world, where you can
21  exchange personal property. A car for a car,
22  a plane for a plane.
23  Similarly, we don't do those and
24  now the tax laws have changed in the last year
25  where they have been now disallowed in the law

```
                                                          69
 1                      F. Trinklein
 2   know what "middle" means.
 3        Q.   Sure.  Was the closing --
 4             To your knowledge, at the time of
 5   the first phone call had the closing been
 6   completed?
 7        A.   No.
 8        Q.   It had not.
 9             Did you discuss, again on this
10   first phone call with Mr. Wechsler, whether
11   checks had already been issued and made
12   payable to the exchanger, the trust, Edtom
13   Trust?
14        A.   No, no.  The assumption -- it was
15   not stated and the assumption would be that it
16   had not taken place.
17             And again, five years ago,
18   conversation of which I have thousands of and
19   so I'm stating all these things to the best of
20   my knowledge and recollection of that time.
21        Q.   Now taking a step back, generally
22   when you're engaged on a potential 1031
23   transaction have you ever -- prior to or aside
24   from the transaction at issue here, have you
25   ever experienced potential clients or their
```

```
                                                          70
 1                      F. Trinklein
 2   attorney calling you at the closing table?
 3        A.   Sure.
 4        Q.   You have?
 5        A.   Sure.
 6        Q.   Is that a fairly common experience?
 7        A.   It's not uncommon.  It has
 8   happened, yeah, multiple occasions.
 9             What typically can occur is that
10   the exchanger first is kind of aware of the
11   fact of the enormity of the tax bill that
12   they're confronting with the sale and "Is
13   there any way we can avoid this tax hit?" and
14   the topic of the 10311 brought up.
15             That is more common than you might
16   think.  Which is fine.  There is nothing wrong
17   with it as long as the exchange is established
18   prior to the closing being consummated,
19   completed; you know, checks being issued, deed
20   being transferred.  That's legitimate and
21   fine.  You can do it minutes before or we like
22   to have weeks before.
23        Q.   You would prefer to have advance
24   notice?
25        A.   Yeah.  I like to discuss things.
```

```
                                                          71
 1                      F. Trinklein
 2   It's preferable, but not practical always.
 3   It's not a perfect world.
 4        Q.   You said before the deed was
 5   transferred.
 6        A.   So what happens at the exchange,
 7   you have this kind of thing (indicating)
 8   happens at the closing.
 9        Q.   A back-and-forth?
10        A.   Yes.  I hand you the checks, you
11   give me the deed.
12        Q.   So if the checks were exchanged to
13   the various parties at the transaction, would
14   that invalidate the potential 1031?
15        A.   If the checks at the transaction
16   are delivered to the exchanger and the
17   exchanger has what is defined as constructive
18   receipt, then that moment in time would negate
19   the potential of doing an exchange.
20        Q.   And when -- okay.
21             Did Mr. Wechsler ask you if it was
22   still possible to do a 1031 with relation to
23   the Edtom Trust transaction?
24        A.   I think that's kind of inherent in
25   the fact that he said that he was going to be
```

```
                                                          72
 1                      F. Trinklein
 2   effectuating this closing.  Is that what
 3   you're saying?
 4        Q.   Did he ask you specifically,
 5   "Fritz, can we still do a 1031 while we are at
 6   the closing table"?
 7        A.   I don't remember the exact
 8   sentences stated but the point was he's at a
 9   closing, would like to do an exchange.  We
10   said, "Okay, develop the documents and send
11   them over.  So I don't remember --
12             (Reporter requested clarification.)
13        A.   Send them over.  Send the documents
14   to him.
15        Q.   Again, Mr. Wechsler didn't tell you
16   whether checks had already been made payable?
17        A.   Right.  If he had said that and in
18   that circumstance the checks had been made
19   payable to the exchanger and delivered to the
20   exchanger, if he had said that, we would have
21   said the exchange cannot be entered into.  So
22   I would say he did not say that.
23        Q.   Did you ask him?
24        A.   No.
25        Q.   Did you ask him if the deed had
```

85

1  F. Trinklein
2      Did you ever have a conversation
3  with anyone at NYDEC discussing the Edtom
4  Trust being a New York trust?
5      A.   I remember having a discussion with
6  Jeff Wechsler relating to that.
7      Q.   What did you discuss with
8  Mr. Wechsler?
9      A.   Well, we're trying to determine why
10 we were not getting a tax identification
11 number.
12     Q.   So you hadn't received a tax
13 identification number as part of the exchange
14 agreement package, if you will?
15     A.   Correct.
16     Q.   And what did Mr. Wechsler say in
17 this conversation that you had?
18     A.   That -- well, it was part of the
19 conversation that the -- the exchanger was in
20 the process of providing the tax
21 identification number.
22     Q.   Providing to whom?
23     A.   NYDEC.
24     Q.   To NYDEC.  And what did you discuss
25 about the exchanger being a New York trust?

86

1  F. Trinklein
2      A.   Well, that's what was told to us,
3  is that the exchanger is a New York trust.
4      Q.   Did you or anyone else at NYDEC ask
5  for a copy of the trust agreement?
6      A.   No.
7      Q.   Did you ever receive a copy?
8      A.   Not to my knowledge.  We wouldn't
9  ever --
10     Q.   You have never seen --
11     A.   There is no purpose for us to have
12 a copy of the trust agreement.
13     Q.   You don't need it?
14     A.   No.
15     Q.   In this conversation you referenced
16 earlier with Mr. Wechsler, a bunch of
17 different issues that you were discussing, was
18 there anything else that you discussed?
19     A.   That was the issue at hand, was we
20 needed the W-9.
21     Q.   You needed it so you asked him for
22 it.  And he said?
23     A.   He's getting it.
24     Q.   Mr. Trinklein, I would like to put
25 before you what has been previously marked as

87

1  F. Trinklein
2  Plaintiff's P.  Take a look and let me know
3  when you are ready for questions.
4      A.   Okay.
5      Q.   Have you seen what has been marked
6  as Plaintiffs' P before today?
7      A.   I did, yes.  I recall it.
8      Q.   What is it, Plaintiffs' P?
9      A.   It is a statement by the
10 exchanger's attorney that until we receive the
11 W-9, the taxpayer's identification number,
12 that the exchanger will not be receiving any
13 interest on the exchange account, which
14 normally they would receive interest.
15     Q.   Did NYDEC write this, what appears
16 to be a letter?
17     A.   Yes.  NYDEC -- yes.
18     Q.   At the bottom of Plaintiffs' P it
19 says "New York Deferred Exchange Corporation."
20 Do you see that?
21     A.   Correct.
22     Q.   Is that in essence your letterhead?
23     A.   Yes.
24     Q.   I would like to draw your attention
25 to the first sentence.

88

1  F. Trinklein
2      A.   Okay.
3      Q.   The letter is addressed to
4  Mr. Wechsler, dated October 22, 2014.
5          What did NYDEC mean when it wrote,
6  "You have advised that your client and
7  exchanger, the Edtom Trust, has not procured a
8  federal employer identification number";
9  specifically what did you mean by "you have
10 advised that"?
11     A.   He said that to us.
12     Q.   So he told you --
13     A.   That he had obtained an EIN number.
14     Q.   Did NYDEC ask Mr. Wechsler to sign
15 this letter?
16     A.   Yes.
17     Q.   Do you know if that signature here
18 is Mr. Wechsler's signature?
19     A.   To the best of our knowledge.
20     Q.   Did you discuss the contents of the
21 letter with anyone at NYDEC?
22     A.   Not that I recall.
23     Q.   Prior to issuing this letter, did
24 you or anyone else at NYDEC ask if the
25 trustees were foreign persons?

22 (Pages 85 to 88)

101

1        F. Trinklein
2    A.   Because they properly identified
3  and showed us evidence of identification to an
4  eligible party.
5    Q.   And you were satisfied with --
6    A.   That representation.
7    Q.   -- that representation?
8    A.   I'm sorry.  Yes.
9    Q.   Would you prefer to have received
10 your standard form?
11   A.   No.
12   Q.   So as long as they give you
13 something in writing, presumably, or something
14 to that effect, you're okay with continuing
15 with the 1031 exchange?
16   A.   Absolutely.
17   Q.   I'd like to show you what is being
18 marked as Plaintiffs' WW.  It's an e-mail
19 Bates stamped NYDEC 097.  It is an e-mail from
20 NYDEC to Jeff Wechsler dated Wednesday,
21 November 19, 2014.  Take a look and let me
22 know when you're ready for questions.
23       (Plaintiffs' Exhibit WW, one page
24       Bates stamped NYDEC097, marked for
25       identification, as of this date.)

102

1        F. Trinklein
2    A.   Okay.
3    Q.   Did you send this e-mail, the top
4  e-mail dated November 19th?
5    A.   I will assume the answer is "yes."
6    Q.   Looking at this document in front
7  of you, Plaintiffs' WW, do you know where it
8  says "quoted text hidden"?  Do you see that?
9    A.   Oh, I don't know.
10   Q.   Do you see that?
11   A.   I don't know.  I think -- isn't
12 that normally a reference in the software
13 used?  Word software does that by truncating
14 text.  I don't think there is a deliberate
15 hidden text; I think it does that by
16 collapsing discussions by itself.
17       I think I've seen that typically,
18 but I can't say.
19   Q.   Do you see where it says at the
20 bottom of the page, 8/24/2018, 10:00 a.m.?
21   A.   Yes.
22   Q.   Do you know why it says that?
23   A.   No.
24   Q.   As part of the exchange of
25 documents in this case did you print out

103

1        F. Trinklein
2  e-mails of yours?  I mean you personally.
3       MR. FERLAZZO:  Note my objection.
4       You can answer.
5    A.   Not to my knowledge.  We probably
6  printed out -- once this case got brought up,
7  we probably printed out documents trying to
8  get our -- know what happened throughout the
9  whole process.  I think that's very possible.
10   Q.   Does NYDEC have any policies
11 related to e-mail retention?
12   A.   No.
13   Q.   Does NYDEC routinely back up their
14 e-mails?
15   A.   I would say there is a backup that
16 happens, our server is backed up.  I don't
17 know how long it's backed up for, I couldn't
18 tell you.
19 RQ      MR. COHEN:  Calling for the
20      production of the entire chain of
21      e-mails, what's referenced here, "quoted
22      text hidden" on NYDEC097.
23          MR. FERLAZZO:  We'll take it under
24      advisement and ask that you follow it up
25      in writing.

104

1        F. Trinklein
2    Q.   I draw your attention,
3  Mr. Trinklein, to the text of this e-mail.
4    A.   All right.
5    Q.   What did you mean when you wrote --
6  withdrawn.
7       You see where there is a list of
8  three items that you're requesting of
9  Mr. Wechsler?
10   A.   Right.
11   Q.   Do you see that?
12   A.   Right.
13   Q.   Are those typical requests that
14 NYDEC makes to terminate an exchange?
15   A.   No.  It's because we were not given
16 a W-9 at this juncture so our antennae were up
17 that something's amiss here.
18   Q.   What did you think was amiss?
19   A.   Well, we didn't know.  But why are
20 we -- approaching the 45th day had we not been
21 provided a W-9?
22   Q.   So why didn't you terminate the
23 exchange?
24   A.   We thought we might be party to a
25 fraud.

26 (Pages 101 to 104)

Page 105

F. Trinklein

Q. What fraud?
A. Fraud of some unknown entity depositing money under our control who misrepresented themselves. So we were very, very -- at this point, very on high alert.
Q. And why did you ask for a notarized FIRPTA affidavit, as written here?
A. That would provide further evidence that this is a legitimate transaction with a non-foreign entity.
Q. What were you concerned about with relation to FIRPTA?
A. That we are trying to establish that this was -- we are not involved in a fraud.
Q. Again, what do you mean by "fraud"?
A. That we may have been party to some kind of scheme whereby money was being deposited under our control under false pretenses.
Q. When you wrote here "an EIN can be quickly obtained if necessary," why did you write that?
A. Because as we are sitting here

Page 106

F. Trinklein

puzzling if this is not a fraud, why wasn't an EIN provided by this point? Because it's relatively simple to do from our perspective. What is the problem?
Q. What -- from your perspective, what is the process to obtain a EIN?
A. Go online, you provide your information on your U.S.-formed entity and the IRS provides the EIN.
Q. So when you wrote this e-mail it was your understanding that they -- that the exchanger did not have an EIN?
A. We were looking for evidence for it, yes, right. We had not been given any evidence of having an EIN and there was a discussion of a potential termination.
Q. And what would that mean?
A. Well, that means if you're terminating, that would mean at the conclusion of a termination checks held in the account are disbursed to the exchanger, which in this case would substantiate the fraud.
This exchanger was not who they purported themselves to be, because there was

Page 107

F. Trinklein

never any legal evidence that they were in fact U.S. citizens.
Q. And them not being U.S. citizens impacts a 1031 exchange how?
A. Well, what happens when --
And this is something, again, we don't do normally. It's the first time because we're thrown into this thing unwittingly. Turns out in an exchange when you handle -- in this circumstance there's a withholding requirement.
Are you familiar with that? Do you need me to go through it?
Q. You answer however you like.
A. In a typical real estate transaction with a foreign person, when a buyer comes in to buy from the foreign person, money has to be withheld from that purchase to the extent of 10 percent of the gross purchase price and sent to the IRS as a withholding agent.
Within the context of a 1031 exchange, the transaction doesn't occur at the time of the relinquished property closing.

Page 108

F. Trinklein

The transaction of when that withholding requirement takes place is at the completion of the exchange process. So that in an exchange where all the money is used to buy replacement property, it's not truncated by the 10 percent withholding. The exchanger has the right to spend all of that money generated from the sale towards the purchase.
It's only if the funds -- the exchange is not completed and the funds are disbursed to the exchanger that the intermediary is now deemed the withholding agent and is under regulations by the IRS to submit that 10 percent out of those funds before the exchanger receives constructive receipt of that money. The money has to be sent to the IRS.
Q. And when does the FIRPTA tax withholding -- when is it supposed to be withheld?
A. To repeat what I just said, so it's at the completion -- it's when the cash, when the funds are to be disbursed to the exchanger is when.

27 (Pages 105 to 108)

**109**

F. Trinklein

So it's when the money first gets transmitted to the foreign person, at that moment 10 percent has to be pulled out of that amount and given to the IRS, then 90 percent goes to the exchanger.

So that can either be at the 45-day period if there is no identification made or at the completion of the exchange period, which is 180 days is when the transaction is occurring, because that's when the cash is being provided to the foreign person.

Q. And in this transaction it wouldn't have been at the closing on October 10, 2014?

A. No. It's an exchange, it's not a sale.

Q. But the FIRPTA tax withholding, the 10 percent that you talked about --

A. Right.

Q. -- wouldn't be -- wouldn't need to have been remitted on October 10, 2014?

A. No, no. A sale transaction did not take place. That's a sale transaction. The property exchange is different than an outright sale transaction. If it had been an

**110**

F. Trinklein

outright sale transaction, it would have been on that relinquished property sale date. But in an exchange, that's not the date that the FIRPTA is -- that the withholding is required.

Q. What do you mean by "outright sales transaction"?

A. We are on an exchange. So you have two parties, you have a buyer and a seller sitting across from each other and I sell property to you, you pay me. That's no exchange involvement; that's a real estate transaction, buy and sell. In an exchange there is not -- it's not considered a sale. It's considered the first portion of a process called a property exchange.

So the terminology can get a little bit ambiguous to the uninformed, but the people that are experts in this field or that know these particular tax ramifications will explain that fact of when does the withholding take place.

And it's pretty obvious why the withholding would not take place early, because let's say you take 10 percent of that

**111**

F. Trinklein

money and now it's being held by the IRS. How would you have money to buy replacement property? You're missing 10 percent of it. It's only after you had the opportunity to spend all of that money on replacement property. And to the extent you don't, that's the moment that that requirement takes place.

Q. The sale of the exchanger's relinquished property, that occurred on October 10, 2014?

A. I would have to look but it sounds familiar. Do you have the --

You gave that to me in an earlier document that showed in an e-mail what the date was of the relinquished property sale.

Q. But it wasn't in April of 2015?

A. No. I think it was October 10th, I believe. You can show me again from that exhibit, but I think it was October 10th. I'm just trying to recall even using different dates. But I think the start of the process, Jeff Wechsler's e-mail saying "We'd like to do an exchange today," was that October 10, 2014?

Q. October 10, 2014.

**112**

F. Trinklein

A. Yes, that's right.

MR. COHEN: Let's take a break.

(Discussion off the record.)

MR. COHEN: Back on the record.

Q. I just want to draw your attention to the exhibit in front of you, Plaintiffs' WW where it says "trust agreement" listing the trustees as authorized signatories for the trust.

A. Right.

Q. Was this the first time you asked for a copy of the trust agreement?

A. I believe that's correct.

Q. Did you receive a copy of the trust agreement?

A. I do not recall if we got a copy of the trust agreement or not.

We're seeing what we need to abort the exchange with these things. Whether we received them or not I'm not sure, because in the end it was not aborted. So in order for us to abort it we would have needed this, but I don't know if they were ever provided or when they were.

```
                                               169
                  F. Trinklein
 1    that line, that middle line.
 2         A.   Yes.
 3         Q.   Did you receive an e-mail on
 4    March 10th from -- written here from Jeffrey
 5    Wechsler?
 6         A.   Yeah, apparently so.
 7         Q.   Do you have any idea how this
 8    Plaintiffs' DD was printed or produced and why
 9    it looks the way it looks?
10         A.   No.
11              MR. FERLAZZO:  Objection.
12              You can answer.
13              THE WITNESS:  Sorry.
14         A.   No, I don't know why it looks like
15    this.  It's a different format than I'm used
16    to seeing.
17         Q.   Do you know -- I mean Mr. Wechsler
18    writes here, "Evan, I just left a message at
19    your office.  Can you please call me?"  Do you
20    know if Mr. Netalios called Mr. Wechsler in
21    response to this e-mail?
22         A.   I don't know.
23         Q.   I will take it back.
24         A.   (Witness handing document.)
25
```

```
                                               170
                  F. Trinklein
 1         Q.   I would like to put before you what
 2    has been previously marked Plaintiffs' EE.
 3    Take a look at that and let me know when you
 4    are ready for questions.
 5         A.   Okay.
 6              Okay.
 7         Q.   Did you write the top e-mail dated
 8    Friday April 10, 2015 at 5:41 p.m.?
 9         A.   Yes.
10         Q.   I'm going to ask you a series of
11    questions about what you wrote in this e-mail.
12         A.   Okay.
13         Q.   Looking at the first sentence you
14    wrote, "As directed by the IRS, we submitted
15    Form 8288 along with the mandated $395,000
16    payment on the final day of the exchange
17    period, April 8, 2015.  Please see the
18    attached."
19         A.   Right.
20         Q.   In that sentence, what did you mean
21    by the words "as directed by the IRS"?
22         A.   According to the rules and
23    guidelines set forth in the instructions of
24    8288.
25
```

```
                                               171
                  F. Trinklein
 1         Q.   So you didn't speak to somebody
 2    from the IRS?
 3         A.   I made a number of attempted calls
 4    within the IRS and they basically said the
 5    instructions were self-explanatory.
 6         Q.   What did you -- how many phone
 7    calls did you make?
 8         A.   I don't recall.
 9         Q.   How many people did you speak to?
10         A.   I would have -- those I would have
11    known this -- if I knew that first one, I
12    would have known the second one.
13         Q.   As part of these phone calls, did
14    they give you any additional information?
15         A.   No, no further guidance.  "Read the
16    instructions."
17         Q.   That was the gist of what they told
18    you?
19         A.   Yes.
20         Q.   Look at the next sentence.
21              "I believe Evan gave you
22    instruction as to how to apply this deposit
23    toward your client's tax return."  What did
24    you mean by that sentence?
25
```

```
                                               172
                  F. Trinklein
 1         A.   That Evan would give instruction to
 2    how to apply this deposit towards the client's
 3    tax return.
 4         Q.   So it's your understanding that
 5    Mr. Wechsler was preparing the exchanger's tax
 6    returns?
 7         A.   Or providing information to his
 8    client to their tax preparer, either/or.
 9         Q.   You didn't have an understanding if
10    he was preparing it himself?
11         A.   No.  No, I did not.
12         Q.   Did you ask him if he was preparing
13    the tax returns for the exchanger?
14         A.   Not to my recollection.
15         Q.   Do you know if anybody at NYDEC
16    asked him if he was preparing and filing tax
17    returns for the exchanger?
18         A.   Not to my recollection.  It's
19    immaterial to what a qualified intermediary
20    does.  I could review what a qualified
21    intermediary does if it would be helpful.
22         Q.   No.  My question is, it made no
23    difference to you?
24         A.   Correct.
25
```

## Page 173

F. Trinklein

Q. That second paragraph you say, "as you will note on the form."

I'm going to ask you what you meant when you wrote, "We are making the case of establishing April 8, 2015 as the 'transfer date' in an attempt to minimize the interest/penalty burden on your client." What did you mean by that whole sentence?

A. So this is to recap what we've done several times before, okay.

So the intent of -- if you read the rules and the guidelines and instructions, they clearly are indicating that the intent of this form is to submit the withholding, withholding tax, at the time that the foreign entity is in receipt of cash. However, the instructions do not specify clearly in the event of a 1031 property exchange how that should be treated. So there's ambiguity.

So we elected to -- for the benefit of the client to make the case that it seemed most appropriate to list the date when the exchanger would first be entitled to having the cash disbursed to them.

## Page 174

F. Trinklein

Q. Okay. I would like to turn your attention towards the bottom of the first page of Plaintiffs' EE.

A. Okay.

Q. This is an e-mail written by Jeffrey Wechsler. I would like to ask you what you understood when he wrote, "Evan, can you please forward the affidavit that we previously discussed for the client to sign."

A. I don't know. That was a communication between Evan and Jeff Wechsler.

Q. So you don't know what that's about?

A. No.

Q. Was there conversations that you were part of for the exchanger to sign affidavits?

A. Not that I recall.

Q. I would like to turn your attention to the third page of Plaintiffs' EE. It's Form 8288. Where it says -- next to "sign here," is that your signature?

A. Yes.

Q. And you dated that 4/10/15?

## Page 175

F. Trinklein

A. Yes.

Q. If you look further up the page next to the number 3 where it says "date of transfer."

A. Yes.

Q. You filled in -- withdrawn.

Who completed this form? Who put in the information into this form?

A. I did.

Q. And you put in April 8, 2015?

A. Yes.

Q. And it was your understanding that the date of the transfer was the last day of the 180-day exchange period?

A. Right. The term -- the date of transfer in the instructions relates to the distribution and availability of the cash to the foreign entity. They -- so the term that they used as far as transfer is ambiguous.

Q. So it was your understanding it didn't mean date of the sale of the relinquished properties?

A. Correct.

An outright sale, not an exchange,

## Page 176

F. Trinklein

the date of the transfer would be the date of the relinquished property closing. But in a property exchange there is no availability of the foreign entity of actual cash receipt and therefore date of transfer does not apply to that date. It's not a critical date. It's the date -- it could be the 45th day if no property is identified.

But it's the date whereby cash is made available to the foreign entity, which in this circumstance is April 8th.

Q. Turning to the next page, did you also put in -- compile the information that is put into this form as well?

A. Yes.

Q. Looking at box 1, date of transfer, the same -- your same thought process as to why you put April 8th, 2015 applies here as well?

A. Yes.

Q. Turning to the next page of the Exhibit, looking at the check dated 4/9/15, where did the money for this check come from?

A. The account that we established for

### 177

F. Trinklein

1  this client, which was a segregated individual
2  account, under NYDEC's tax identification
3  number but for clarity purposes had its own
4  account for accounting purposes.
5   Q.  What do you mean, for accounting
6  purposes?
7   A.  So that all parties would be aware
8  that this money is being held on behalf of
9  Edtom Trust.
10   Q.  Per this e-mail, Plaintiffs' EE and
11  the attachments, you remitted the 8288 and the
12  withholding, correct?
13   A.  Correct.
14   Q.  Did you ever receive any
15  communications from the IRS in response or
16  related to what you filed?
17   A.  No.
18   Q.  Did you ever -- did NYDEC ever
19  receive confirmation from the IRS that the
20  forms on the money were received and accepted?
21   A.  No, other than cash checks.
22      MR. LENTINELLO:  Can we take a
23  break?
24      MR. COHEN:  Sure.

### 178

F. Trinklein

1   (Recess taken 3:40 p.m.)
2   (Resumed at 3:57 p.m.)
3   Q.  Hello, Mr. Trinklein.  How are you?
4   A.  Very well.
5   Q.  We have been looking at a series of
6  exhibits from the months October, November,
7  December of 2014 into March and April of 2015;
8  is that right?
9   A.  Yes.
10   Q.  After the 45-day identification
11  period until the 180-day end of the exchange
12  period, did Mr. Wechsler make demands upon
13  NYDEC to return the exchange proceeds?
14   A.  I don't believe so.
15   Q.  I would like to put in front of you
16  what has been previously marked as Plaintiffs'
17  G.  I want you to take a look at that.
18      MR. COHEN:  Off the record.
19      (Discussion off the record.)
20      MR. COHEN:  Back on the record.
21   A.  Yes, I have reviewed it.
22      MR. COHEN:  Off the record.
23      (Discussion off the record.)
24      MR. COHEN:  Back on the record.

### 179

F. Trinklein

1   Q.  Mr. Trinklein, I would like to turn
2  your attention to the third page of
3  Plaintiffs' G in front of you.  NAFTALI-00013
4  is the Bates stamp at the bottom.
5   A.  Okay.
6   Q.  There are a series of checks here.
7  Looking at the top check, prior to today have
8  you ever seen that check before?
9   A.  Yesterday my attorneys were going
10  through a bunch of documents.  There were
11  checks that were included in that grouping but
12  other than what I might have seen yesterday,
13  no, I have never seen this before that I
14  recall.
15   Q.  Do you see on this top check where
16  it says "to the order of the Edtom Trust"?
17   A.  Yes.
18   Q.  And do you see where somebody wrote
19  in "void"?
20   A.  Yes.
21   Q.  Do you see where the date is
22  labeled 10/09/14?
23   A.  Yes.
24   Q.  We were discussing earlier, you

### 180

F. Trinklein

1  were discussing a constructive receipt of
2  proceeds of a sale.  Do you recall having a
3  conversation about that?
4   A.  Yes.
5   Q.  Is it your understanding from
6  looking at this check that a check was made
7  payable to the Edtom Trust?
8   A.  Yeah, it does appear as though a
9  check was made payable to the Edtom Trust.
10   Q.  Looking at this, does that change
11  your understanding of whether there was
12  constructive receipt or receipt in any way by
13  the exchanger from the proceeds of the sale of
14  their property?
15   A.  Not necessarily.  It depends
16  whether this check was presented to the Edtom
17  Trust.  If it was presented, then that would
18  be a problem.  If there was an actual closing
19  that takes place as we discussed earlier where
20  a check is presented and held and has control
21  over and the deed is moved, then the closing
22  has occurred.  So the existence of a check
23  does not preclude an exchange from occurring.
24   Q.  But if the trustees of the Edtom

181

F. Trinklein

1
2  Trust had this check, prior to someone writing
3  "void," in their hands and they walked out of
4  a closing, to your understanding would that
5  void --
6      A.   To the best of my problem, that
7  would be a problem.
8      Q.   That would be a problem?
9      A.   That would be a problem.  Because
10 if a closing has occurred and the seller, the
11 exchanger, has physical receipt of the funds
12 and the closing is now adjourned so to speak,
13 I mean it's a completed closing.  Then you
14 cannot undo that event.
15     Q.   Does it matter if their receipt is
16 five dollars or $5 million?
17     A.   They are allowed to receive money
18 at the closing but it's taxable to the degree
19 they receive cash.  It's called taxable boot,
20 B-O-O-T.
21          So an exchanger is permitted to
22 have proceeds paid to them but that cannot be
23 reversed back into the exchange account.  It's
24 taxable.  That portion is taxable.
25          Exchangers sometimes will want

182

F. Trinklein

1
2  money at the closing and pay tax on it.  It's
3  not an all-or-nothing provision; it's the
4  degree you receive the cash and have the
5  ability to spend it that you're taxed at that
6  time.
7      Q.   Okay, let me take that back from
8  you.
9      A.   (Witness handing document.)
10     Q.   Thank you.
11          I want to draw your attention to
12 the time period of April of 2015.
13     A.   Okay.
14     Q.   And specifically after the 180-day
15 exchange period has expired on this
16 transaction.
17     A.   Okay.
18     Q.   So calling it day 181, if you will.
19 Does that make sense to you?
20     A.   Yes, it does.
21     Q.   Okay.  Day 181 comes around on this
22 transaction and aside from $395,000 that NYDEC
23 remitted to IRS for FIRPTA tax withholding
24 which we had talked about and $96,000 that was
25 remitted to New York State for tax

183

F. Trinklein

1
2  withholding, on day 181 NYDEC was still
3  holding the rest of the exchange proceeds?
4      A.   That's correct.
5      Q.   Why?
6      A.   Because NYDEC, through the
7  misrepresentation of the exchanger, was put
8  into a liability stance from the IRS based on
9  the exchanger's misrepresentation to NYDEC.
10     Q.   You are talking about liability and
11 possible fees and taxes and penalties and
12 things like that?
13     A.   Correct.
14     Q.   On what -- what are you relying
15 upon?  What did you look at to make that kind
16 of determination?
17     A.   The 8288 instructions delve into
18 that as well as we then started to engage
19 professional support to determine to what
20 extent were we exposed to IRS fines and
21 penalties.
22     Q.   What professionals did NYDEC
23 engage?
24     A.   Greenberg Traurig, the national
25 firm, has a FIRPTA withholding group down in

184

F. Trinklein

1
2  Florida that we commissioned to find out what
3  the maximum penalties could be assessed on
4  NYDEC based on misrepresentation by the
5  exchanger.
6      Q.   You say "could be"?
7      A.   Yes, potentially.
8      Q.   Has NYDEC -- has NYDEC incurred any
9  liability, any penalty, damages, anything from
10 the --
11          Have you been informed by the IRS
12 of anything?
13     A.   Not to date.
14     Q.   So today it's all still potential?
15     A.   Yes.
16     Q.   So how have you been damaged and
17 hurt by what you are characterizing as a
18 mischaracterization by the exchanger?
19          MR. FERLAZZO:  Objection.
20          You can answer.
21     A.   So there is a potential that we get
22 a bill, as outlined by Greenberg Traurig
23 specialists, that could exceed $400,000 due
24 and payable by NYDEC, and there are about --
25          You would have to -- you could

## Page 185

F. Trinklein
enumerate the different statutes that arrive at significant numbers and there is many aspects to that whole analysis that go well beyond my understanding.

What we were trying to accomplish was to protect the viability of our company based on the misrepresentation by the single client. We try to go through different methods by which to protect ourselves, such as a legal opinion by the exchanger's attorney that we could then at least have recourse.

In the event of a foreigner who is not in the country, we would have no ability to try to receive compensation back if a fine were to be levied on NYDEC for a foreign entity. So we were in a very, very susceptible position and that was our -- we are -- our need was to protect NYDEC's future against this misdeed.

Q. You used the word "future." Earlier you testified about viability. What do you mean by that?

A. We would be very hard pressed to be an ongoing concern if the IRS were to levy a

## Page 186

F. Trinklein
significant penalty on us because of our withholding requirements that had not been properly met in their perspective.

Q. What do you mean by "ongoing concern"?

A. That means that the business doesn't collapse, fold based on insolvency, meaning no money in the bank.

Q. So you were concerned about insolvency?

A. Yes.

Q. And having to close up shop?

A. Yes.

Even the damages that have already been affected NYDEC because of this case on social media where people when they Google NYDEC now see -- sees a federal case against it has already created significant financial damages because of lost business.

This is a very high-trust business. We are holding a lot of money on behalf of other parties. And so not only has there been significant damage but the cash --

The IRS doesn't -- isn't patient

## Page 187

F. Trinklein
with payments. They assess a penalty, they take it. It is not a forgiving group.

So we were in a very, very susceptible position.

Q. You just mentioned lost business.

A. Uh-huh.

Q. Have you undergone any type of analysis or any fact-gathering --

A. Just people telling us --

Q. Let me finish.

A. I'm sorry.

Q. -- to ascertain how much or to what extent you have actually lost business opportunities?

A. No, not an analysis other than attorneys telling us that multi-million dollar deals have gone to another QI due to this lawsuit. But we have not gone to the extent of really providing the complete analysis of that.

And it would be difficult because we only know of certain circumstance where attorneys have told us, but because of social media as people are searching the Internet and

## Page 188

F. Trinklein
they're picking a QI, that lawsuit that pops up would just move them to another qualified intermediary which we'll never know about. But we are familiar with attorneys that have told us that we have lost significant deals. When I mean significant, seven-figure deals.

RQ  MR. COHEN: Calling for the production of all communications, documents, evidencing attorneys or other people informing NYDEC that deals would have been or were lost because of the litigation or anything related to damages that NYDEC might have incurred as he has just testified to.

MR. FERLAZZO: Taken under advisement, and ask that you follow up in writing.

Q. So, Mr. Trinklein, you testified a few moments ago --

And I'm summarizing here, so if I'm misstating something that is different from what you believe you said, let me know.

-- that you received a legal opinion letter or some type of statement that

```
                                    189
 1                F. Trinklein
 2   NYDEC may or could be exposed to damages,
 3   penalties in excess of $400,000?
 4        A.   If you add all the different
 5   provisions that they outline based on the
 6   level of what they would term fraud, the
 7   numbers do climb to that level.
 8        Q.   Was there a cap or was that number
 9   going to continue to grow or increase?
10        A.   There are --
11        Q.   From what you understood.
12        A.   There are some provisions on
13   interest and I don't know -- I couldn't answer
14   the question to what degree they grow but they
15   were based on size of -- the amount of money,
16   the time period from when they would state the
17   money should have been sent to them, and then
18   the intent, underlying intent.  So it gets
19   fairly technical.
20        Q.   So given that opinion letter which
21   you're relying upon to state that penalties
22   could be assessed but that they haven't, but
23   that they could be assessed, why didn't you
24   release everything -- from the exchange
25   proceeds to the trust everything but that
```

```
                                    190
 1                F. Trinklein
 2   $400,000 approximate number?
 3             MR. FERLAZZO:  Objection.
 4             You can answer.
 5        A.   We attempted, to the best of our
 6   ability, to arrive on an agreement based on
 7   the facts that we had.
 8             And I believe at that time the
 9   exchanger fired their attorney and we had no
10   way of contacting the client.  Where they had
11   information about us -- location, telephone
12   numbers, e-mail addresses -- we had zero on
13   them.  There was no contact ability for NYDEC
14   to reach them to say, "We're looking to come
15   to some kind of an agreeable sum that makes
16   sense based on the exposure that we have to
17   the IRS based on your actions."  We wanted to
18   do that and were not able to.
19        Q.   Did you ever speak to Roni Naftali
20   in person?
21        A.   No.
22        Q.   He never came to your office?
23        A.   No.
24        Q.   And as of today, per agreement
25   between the parties, 200,000 dollars are
```

```
                                    191
 1                F. Trinklein
 2   withheld and are sitting in my firm's escrow
 3   account; is that correct?
 4        A.   Correct.
 5   RL   Q.   And it's your position today that
 6   you are not -- you're refusing to release that
 7   money as of today?
 8   DI      MR. FERLAZZO:  Objection.
 9             Don't answer that.  Calls for
10        attorney-client privilege.
11             MR. COHEN:  I am not asking about
12        communications.
13             MR. FERLAZZO:  His understanding of
14        what is happening in this case and why
15        actions are being taken in this case
16        comes definitely from his communications
17        with counsel, so he is not going to
18        answer that question.
19             MR. COHEN:  I am not asking about a
20        communication that he had with you or you
21        had with him.
22             MR. FERLAZZO:  His understanding of
23        what happened in this case --
24             The attorney-client privilege
25        covers more than necessarily the actual
```

```
                                    192
 1                F. Trinklein
 2        he said/she said.  To the extent he has
 3        an understanding of what is going on and
 4        it comes from me telling him that or
 5        other counsel for him telling him that,
 6        that's also protected.  And he's not
 7        going to answer that question because
 8        what's going on in this litigation, his
 9        understanding of that is based on his
10        communications with me and his counsel in
11        this case.
12             MR. COHEN:  You have stated your
13        position, I have stated my position.
14        Note that for a potential ruling.
15             MR. LENTINELLO:  Off the record.
16             (Discussion off the record.)
17             MR. COHEN:  Back on the record.
18        Q.   Mr. Trinklein, I would like to put
19   before you Plaintiffs' FF, previously
20   produced.  Take a look at that and let me know
21   when you're ready.
22        A.   Okay.  I'm ready.
23        Q.   Did you receive the top e-mail
24   here?
25        A.   Yes.
```

193

F. Trinklein
Q. Plaintiffs' FF?
A. Yes, yes.
Q. I draw your attention to the bottom of the first page.
A. Right.
Q. That e-mail from Joseph Taplitzky, did you receive that e-mail?
A. Yes.
Q. It starts with "to follow our conversation." Do you recall speaking to Mr. Taplitzky?
A. I remember talking to Taplitzky.
Q. Do you remember what you spoke about?
A. No.
Q. Okay. Do you know who Jordan Barness is?
A. I've heard the name. I think -- yeah, I don't know if I ever spoke with him but I remember the name.
Q. So you can't remember if you ever spoke with him?
A. I do not remember if I spoke with him or not.

194

F. Trinklein
Q. I would like to draw your attention to the top e-mail.
A. Okay.
Q. And you said you received this e-mail, yes?
A. Yes.
Q. What did you understand this e-mail from Mr. Wechsler, "Client would like the balance of the funds wired to their account"?
A. I think they're asking to have the balance of the funds wired to their account.
Q. Balance of the funds being the balance of the -- this is your understanding, the exchange proceeds?
A. Yes.
Q. What did you understand when Mr. Wechsler wrote, "We have discussed releasing a portion of the funds and that Evan would also prepare documents for the clients to sign"?
A. Right. So this is still -- Jeffrey Wechsler is still involved and we're trying to reach a determination as to what portion of the funds can be released.

195

F. Trinklein
Q. What did you understand by Mr. Wechsler wrote here, "Evan would also prepare documents for the clients to sign"?
A. Right. So Evan then would prepare as part of the agreement to release the monies that they understand the circumstances under which the money is being released.
Q. Under what circumstances? What do you mean by that?
A. Well, there's an unresolved problem.
Q. What unresolved problem?
A. That the IRS could be holding NYDEC with severe penalties.
Q. And at this time no agreement was reached?
A. No. There was a -- at this point we were attempting to reach an agreement.
Q. Were drafts of any potential agreements or contracts issued between the parties, to your knowledge?
A. Not that I'm aware of.
MR. COHEN: All right. I'm going to introduce Plaintiffs' XX, Bates stamp

196

F. Trinklein
numbers NYDEC 058, 059, 060, 061. It appears to be some type of series of bank statements.
(Plaintiffs' Exhibit XX, pages Bates stamped NYDEC058 to NYDEC061, marked for identification, as of this date.)
Q. Mr. Trinklein, if you would review Plaintiffs' XX and let me know when you're ready for questions.
A. Okay.
Q. What is -- what are these series of pages here I have marked as Plaintiffs' XX?
A. Apparently, at least I can address page 1. This is a bank statement enumerating funds that are deposited into a NYDEC account.
Q. Where is the NYDEC account located, at what bank?
A. It doesn't say.
Oh, wait. Here at the bottom, Sterling National Bank. It says -- if I can direct your attention to page number 3, if you look at the final line where there is a recognition and a thank you from Sterling National Bank.

```
                                          213
 1              F. Trinklein
 2    IRC Section 1031 transaction (exchange) upon
 3    the advice and counsel of professionals
 4    unrelated to NYDEC."
 5           MR. FERLAZZO:  Objection.  Based on
 6       the attorney-client privilege, I will
 7       allow the witness to answer only to the
 8       extent he understands what that sentence
 9       means other than an understanding he
10       obtained from talking to counsel.
11           THE WITNESS:  So I can proceed?
12           MR. FERLAZZO:  Yes.
13       A.   I would just say I understand it as
14    written.  It seems exceedingly clear to me.
15    What word is throwing you off?
16       Q.   Didn't Mr. Wechsler call you at the
17    closing table on October 10, 2014?
18       A.   Yes.
19       Q.   And he asked you, among other
20    questions, whether the 1031 could still be
21    done while they were at the closing table?
22       A.   Yes.
23       Q.   And you told him that he could?
24       A.   Yes.
25       Q.   I was just trying to understand
```

```
                                          214
 1              F. Trinklein
 2    "professionals unrelated to NYDEC" and how you
 3    were involved.
 4       A.   Oh, okay.  The word "unrelated" is
 5    what is doing it?
 6           "Unrelated," I think Evan is
 7    referring there to not a -- as a third party
 8    to NYDEC.  We cannot -- as a qualified
 9    intermediary, you cannot have any professional
10    or personal relationship.  It's got to be
11    truly arm's-length.
12           And so that's, I think, what this
13    is, the unrelated party permitting NYDEC to
14    act as qualified intermediary in the exchange.
15    I think that's what the term "unrelated" in
16    this circumstance is referring to.
17           MR. COHEN:  Okay.  Let's take a
18       two-minute break.
19           MR. FERLAZZO:  Sure.
20           (Recess taken 4:52 p.m.)
21           (Resumed at 5:01 p.m.)
22           MR. COHEN:  Back on the record.
23       I have just shown Plaintiffs' AAA
24    to Mr. Trinklein.  Counsel for
25    Mr. Trinklein had objected to the extent
```

```
                                          215
 1              F. Trinklein
 2       that attorney-client privilege related to
 3       his understanding based on those
 4       conversations and advice.
 5           Is that accurate?
 6           MR. FERLAZZO:  That's accurate.
 7           MR. COHEN:  As I've stated
 8       previously on the record, the document
 9       Plaintiffs' AAA is not a privileged
10       document.  It's a letter.  I'm renewing
11       my position with respect to the objection
12       and reserving all rights to get a ruling
13       from the court.
14           There is now a series of
15       back-and-forths here and we'll resolve
16       them at a later time.
17           MR. FERLAZZO:  And I'll just put on
18       the record, too.  With respect to the
19       question earlier about the $200,000 held
20       in escrow we are willing to allow
21       Mr. Trinklein to answer to the extent
22       that his response is not based on any of
23       his conversations with counsel.
24           MR. COHEN:  Okay.  Thank you.
25       Q.   Why don't we start there.
```

```
                                          216
 1              F. Trinklein
 2           As you're sitting here today, why
 3    is NYDEC continuing to withhold and won't
 4    release the $200,000 of the exchange proceeds
 5    that by agreement are sitting in my firm's
 6    escrow account?
 7       A.   To the best of my knowledge, we
 8    still have not received verification from the
 9    IRS that we are not liable due to your
10    client's actions, and there is no way that we
11    can obtain that to our knowledge.  So if
12    you're able to obtain that letter from the IRS
13    absolving NYDEC, that objection would then be
14    relieved.
15       Q.   So, for example, if the IRS issued
16    some type of communication for closing
17    liability towards NYDEC and it was
18    satisfactory to you, under those circumstances
19    you would allow the money to be released to
20    the exchanger?
21       A.   To the best of my knowledge.  To my
22    knowledge.  I understand that to be the key
23    issue at hand.
24       Q.   We were looking at bank statements
25    a little earlier, not too long ago.  Did NYDEC
```