# Exhibit L

# In the Matter Of:

15-cv- 7152 (JMA) (ARL)

NAFTALI AS TRUSTEES OF THE EDTOM TRUST

v.

NEW YORK DEFERRED EXCHANGE CORP., et al.

## Depositon of Jeffrey Wechsler

*Thursday, September 5, 2019*

**CONDENSED**



The Little Reporting Company
330 West 38th Street
Suite 404
New York, NY 10018
tel: 646 650 5055
www.littlereporting.com

## Page 1

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
ORA NAFTALI AND RONI NAFTALI,
AS TRUSTEES OF THE EDTOM TRUST,    Civil Action
         Plaintiffs,               No. 15-cv-7152
    - v -                          (JMA)(ARL)
NEW YORK DEFERRED EXCHANGE
CORP., AND JEFFREY L. WECHSLER

         Defendants.
--------------------------------------X
NEW YORK DEFERRED EXCHANGE CORP.,

    Counterclaim Plaintiff,

    - v -

ORA NAFTALI AND RONI NAFTALI, AS
TRUSTEES OF THE EDTOM TRUST,
    Counterclaim Defendants.
--------------------------------------X
NEW YORK DEFERRED EXCHANGE CORP.,
    Third-Party Plaintiff,
    - v -
ORA NAFTALI AND RONI NAFTALI,
    Third-Party Defendants.
--------------------------------------X
                    September 5, 2019
                    10:19 a.m.

    DEPOSITION OF JEFFREY L. WECHSLER

Reported by:
Elizabeth Santamaria
```

## Page 2

```
--------------------------------------X
ORA NAFTALI AND RONI NAFTALI,
    Third-Party Counterclaim Plaintiffs,
    - v -
NEW YORK DEFERRED EXCHANGE CORP.,
    Third-Party Counterclaim Defendants.
--------------------------------------X
ORA NAFTALI AND RONI NAFTALI,
    Third-Party Cross-Claim Plaintiffs,
    - v -
JEFFREY L. WECHSLER,
    Third-Party Cross-Claim Defendants.
--------------------------------------X
JEFFREY L. WECHSLER,

    Third-Party Plaintiff,
    - v -
JOSEPH TAPLITZKY,
    Third-Party Defendant.
--------------------------------------X

            September 5, 2019
            10:19 a.m.
    Deposition of JEFFREY L. WECHSLER,
pursuant to Order, at the offices of MILBER
MAKRIS PLOUSADIS SEIDEN, 1000 Woodbury Road,
Woodbury, New York, before Elizabeth
Santamaria, a Reporter and Notary Public of
```

## Page 3

```
A P P E A R A N C E S:

KISHNER MILLER HIMES P.C.
Attorneys for Plaintiffs/Counterclaim Defendant
Ora Naftali and Roni Naftali
    40 Fulton Street - 12th Floor
    New York, New York
BY: JONATHAN COHEN, ESQ.
    (212)585-3425
Email: Jcohen@kishnerlegal.com

MILBER MAKRIS PLOUSADIS SEIDEN
Attorneys for Third-Party Cross-Claim Defendant
Jeffrey L. Wechsler
    1000 Woodbury Road - Suite 402
    Woodbury, New York 11797
BY: JOHN ANTHONY LENTINELLO, ESQ.
    (516) 712-4000
Email: Jlentinello@milbermakris.com
```

## Page 4

```
A P P E A R A N C E S (c o n t'd):
HINSHAW & CULBERTSON LLP
Attorneys for Defendant and
Counterclaim Plaintiff/
Third-Party Plaintiff/
Third-Party Counterclaim Defendant
New York Deferred Exchange Corp.
    800 Third Avenue - 13th Floor
    New York, New York 10022
BY: MATTHEW C. FERLAZZO, ESQ.
    SUZANNE WALSH, ESQ.
    (212) 471-6200
Email: Mferlazzo@hinshawlaw.com
Email: Swalsh@hinshawlaw.com

ORLOFF LOWENBACH STIFELMAN & SIEGEL, PA
Attorneys for Third-Party Defendant
Joseph Taplitzky
    44 Whippany Road - Suite 100
    Morristown, New Jersey 07960
BY: MARC C. SINGER, ESQ.
    (973) 622-6200 X423
Email: Mcs@olss.com
```

```
                                        69
 1                J. Wechsler
 2        Q.   Did you speak to the buyer's
 3   counsel about FIRPTA withholding?
 4        A.   Possibly.
 5        Q.   But you don't remember
 6   specifically?
 7        A.   Correct.
 8        Q.   Did you speak to the buyer's
 9   counsel about the seller possibly utilizing a
10   1031 exchange?
11        A.   Possibly.
12        Q.   Did you issue check instructions to
13   the buyer's counsel?
14        A.   Yes.
15        Q.   Do you recall who you requested the
16   sale proceeds be made payable to?
17        A.   There were numerous checks that
18   would have been issued.
19        Q.   Would checks be made issued to the
20   Edtom Trust?
21        A.   There would have been checks to
22   them.  The checks to pay off the bank, checks
23   to others.
24        Q.   What about to a 1031 exchange
25   company?
```

```
                                        70
 1                J. Wechsler
 2        A.   If we were doing a 1031, yes.
 3        Q.   Were you doing a 1031 prior to the
 4   date of the closing?
 5        A.   Prior to the date --
 6             MR. SEIDEN:  Objection to form.
 7        Go ahead.
 8        A.   You don't do a 1031 prior to the
 9   date, you do it at the date of the closing.
10        Q.   Were you planning -- were you
11   planning to -- sorry, withdrawn.
12             Were the Naftalis planning to
13   perform a 1031 exchange as part of this
14   transaction prior to the closing?
15        A.   At the closing.
16        Q.   Did you discuss it with them prior
17   to the closing, about utilizing the services
18   of a 1031 exchange company?
19        A.   At the closing.
20        Q.   You only discussed it at the
21   closing?
22        A.   Correct.
23        Q.   You never discussed it with them
24   prior to the closing?
25        A.   Possibly, but I don't recall.
```

```
                                        71
 1                J. Wechsler
 2        Q.   What documents did you prepare for
 3   the closing?
 4        A.   It was in my closing binder,
 5   whatever I prepared.  You have my closing
 6   binder.
 7        Q.   Did you prepare a FIRPTA affidavit?
 8        A.   Yes.
 9        Q.   You prepared a FIRPTA affidavit?
10        A.   I believe there would have been one
11   in my closing binder.  Can we pull my closing
12   binder?  I have to see the closing binder.
13        Q.   Did you advise the client to obtain
14   a tax withholding certificate -- withdrawn.
15             MR. COHEN:  I will take that back.
16        Thank you.
17             (Witness handing document.)
18        Q.   I would like to focus your
19   attention to the day of the closing on the
20   sale of the trust's property.  Where did the
21   closing take place?
22        A.   Corcoran offices, C-O-R-C-O-R-A-N.
23        Q.   What time did it start?
24        A.   I don't recall the time.  It was at
25   their office, 660 Madison.
```

```
                                        72
 1                J. Wechsler
 2        Q.   Did the closing start in the
 3   morning?
 4        A.   I don't recall the exact time that
 5   the closing occurred.
 6        Q.   Was the closing the first time you
 7   met the Naftalis in person?
 8        A.   Yes.
 9        Q.   Was there any discussion about the
10   Naftalis closing via power of attorney?
11        A.   Possibly.
12        Q.   Do you remember discussing it with
13   the Naftalis that they could close via power
14   of attorney?
15        A.   Possibly.
16        Q.   Who was at the closing?
17        A.   Ora Naftali, Roni Naftali.  George
18   Bunn, his client was not there.  There was a
19   title closer, I don't recall the title
20   closer's name.  And Joseph Taplitzky.  And
21   there might have been another broker, I don't
22   recall.
23        Q.   Anybody else?
24        A.   Not that I'm aware of.
25             MR. SEIDEN:  Other than
```

18 (Pages 69 to 72)

Page 73

J. Wechsler

1 Mr. Wechsler.
2 A. And myself. Sorry.
3 Q. Who did you sit next to at the closing?
4 A. Normally I sit next to my clients.
5 Q. Did you sit next to Ora and Roni Naftali at the closing table for this transaction?
6 A. One of them would have sat next to me. Usually husband and wife sit next to each other and I sit next to one of them.
7 Q. Do you remember if you sat next to Ora Naftali?
8 A. No. Whether it was Ora or Roni Naftali, I sat next to one of them.
9 Q. You don't remember which one?
10 A. I don't see the relevance, but anyway...
11 Q. Let me worry about the relevance. I'm asking the questions.
12   Do you remember --
13 A. I sat in the conference room to do a closing and I sat next to one of my clients. Whether it was Roni or Ora that I sat next to,

Page 74

J. Wechsler

I don't know.
Q. Do you remember where Joseph Taplitzky was sitting?
A. No.
Q. Was he sitting next to Ora Naftali?
A. I don't recall where he was sitting, I don't recall where Ora was sitting.
Q. How did the closing proceed?
A. Well.
Q. What did you discuss with the buyer's counsel?
A. Be more specific.
Q. During the closing did you have any conversations with the buyer's counsel?
A. It was a normal transaction.
Q. What did you discuss with him?
A. We were discussing the transaction.
Q. Did you discuss the FIRPTA tax withholding?
A. We had the FIRPTA form on the table.
Q. That you prepared?
A. That Naftalis signed.
Q. The Naftalis signed a FIRPTA form

Page 75

J. Wechsler

at the closing table?
A. If it was in my closing binder. Can I look at my closing binder?
Q. I'm asking you if they signed a FIRPTA form.
A. I believe, and I said I believe so.
Q. You said they did?
A. I believe they signed a FIRPTA form.
Q. Did you prepare a FIRPTA form -- FIRPTA affidavit for this transaction?
A. And I said I believe so.
Q. Did you discuss with the buyer's counsel about a 1031 exchange being part of this transaction?
A. At this transaction Joseph brought up the 1031 discussion at the closing, Joseph Taplitzky, to the Naftalis.
Q. What did he say to the Naftalis?
A. He brought up the idea of doing it. I explained how the transaction of a 1031 works, and then what happened was subsequently like they decided to go forward to do a 1031. They agreed at the closing to do the 1031.

Page 76

J. Wechsler

Q. When you say they agreed, what do you mean?
A. They decided they wanted to save the taxes and so they said they wanted to do the 1031. So that was in -- that was specifically -- even Roni said that in his testimony at his deposition.
Q. When during the closing -- was it towards the beginning, middle, the end -- did Joseph bring up, as you say, using a 1031 exchange?
A. I don't remember when the conversation occurred but the conversation occurred, we discussed it.
  They decided to do that, then they gave me back the checks. I spoke to Fritz to make sure it can be done because we were in the middle of a closing and we had to get everything done the same day.
Q. Did you advise the clients to sign certain documents at the closing?
  MR. SEIDEN: Objection to form.
A. There is always documents signed at a closing.

19 (Pages 73 to 76)

Page 77

J. Wechsler
Q. Did you advise them to sign transfer tax returns?
A. Correct.
Q. How did the Naftalis know where to sign their names on the transfer tax returns for this transaction?
A. I would have indicated where they would sign.
MR. COHEN: I would like to mark Plaintiffs' Exhibit F. It starts with Bates stamp number JLW000065 and ends with JLW000083.
(Plaintiffs' Exhibit F, pages Bates stamped JLW000065 to JLW000083, marked for identification, as of this date.)
Q. If you would review the document in front of you, Mr. Wechsler, and let me know when you are ready for questions.
A. Ready.
Q. Did you prepare these transfer tax returns?
A. I stated earlier I have an abstract company that would prepare it.
Q. At your direction?

Page 78

J. Wechsler
A. Yes.
Q. Why didn't you prepare them yourself?
A. Because the abstract company charges like $150 to prepare them, and did you ever prepare ACRIS documents? It's cumbersome. It's easier to have a professional that's used to doing it.
Q. Did you review them prior to the closing table?
A. Yes.
Q. Did you identify any mistakes?
A. At the time, prior to the closing table?
Q. When you reviewed it, did you identify any mistakes?
A. At the time?
Q. At the time.
A. No.
Q. Did you ask them to make any changes to the transfer tax returns when they prepared them for you?
A. "They" being?
Q. The abstract company.

Page 79

J. Wechsler
A. No. We needed a -- we needed the tax ID numbers, which I was always told I was going to be getting.
Q. I would draw your attention to the second page of this exhibit, Bates stamp number JLW000066.
If you look towards the top where it says "Social Security number," below it it has a series of 9s. Do you see that?
A. Sure. Yes.
Q. Did anyone comment on the fact that the seller's Social Security number was listed as all 9s during the closing?
A. During the closing I don't recall but I know that what happens is when the abstract companies prepare these, if they don't have it they just put in 9s and fill in later.
Again, I mentioned to you that I asked Roni and Ora for tax ID numbers, which they always said they had, and I was hoping to get the tax ID numbers.
Q. Did you ask Ora Naftali at the closing table for the tax ID number?

Page 80

J. Wechsler
A. Correct.
Q. I'm asking you, you did?
A. That was a "yes."
Q. At the closing table --
A. I would have asked for the tax ID numbers because I needed the tax ID numbers. It was only subsequent to asking that I finally learned that they did not have tax ID numbers, and then I -- then they then asked me to apply for tax ID numbers.
Q. Did anybody else comment on the fact that what was listed here is a series of 9s?
A. Again, so when you point to "here" you're referring to the New York City RPT form, the security number filled in with all 9s on page 1 of the RPT. I don't recall who would have made a comment, but most likely yes.
Q. If you could turn to the page Bates stamp numbered JLW000078.
A. Yes.
Q. Did you direct the Naftalis to sign their names underneath the certification of

20 (Pages 77 to 80)

81

J. Wechsler
resident transferor/seller?
   A. The answer would be yes, because basically that's a certification of resident transferor and at that time I was under the understanding and belief that they were a resident of 43-UI in the same building for which we were selling 42-UI. So they signed this page 78 and page 79 also.
   Q. It was your understanding that they lived in the condominium they were selling?
   A. No, I didn't say that. What I stated just now is that -- do you want to read it back or should I?
     I stated that they resided in 43-UI and that we were selling 42-UI. On page 1 of the tax return -- transfer tax forms, we have their address being unit 43-UI at 322 West 57th Street. I was told that was their address.
   Q. Who told you that was their address?
   A. I would have learned that either from the Naftalis or their agent, Joseph Taplitzky.

82

J. Wechsler
   Q. When did they tell you that?
   A. Prior to me having the abstract company write this form. I wouldn't have guessed that address.
   Q. Did they send it to you in an e-mail?
   A. I don't recall if it was an e-mail or a telephone call. That's why you're referring to this page, certification of being a New York State resident.
     When I did this form, I was under the understanding and belief because they had 43-UI that they were a New York state resident at that time.
   Q. Did you see their photo IDs at the closing?
   A. Yes.
   Q. What type of ID did they provide?
   A. I believe it was Israeli passports at that time.
   Q. Did you think then that the Naftalis were Israeli citizens?
   A. Possibly at that time. I know people that have dual citizenships.

83

J. Wechsler
   Q. Did that change your understanding of the nature of the trust?
   A. Of the nature of the trust at the time in October of 2014, no, because I was under the understanding and belief that the trust was a New York trust, New York state trust, as I stated earlier.
   Q. Did you advise the Naftalis to issue a FIRPTA affidavit at the closing?
     MR. SEIDEN: Objection to form.
   A. Okay. We previously discussed that and I previously answered that. And I ask, can I see my closing binder? Because I believe the answer would be yes, if I could look at my closing binder. May I look at it?
   Q. I don't know what you mean by "closing binder."
   A. You should know because you would have a copy of the closing binder.
   Q. I have the documents that are in front of you. If you don't remember, you don't remember. I am asking you the question. You are asking me to show you a document.
     MR. SEIDEN: He says he needs to

84

J. Wechsler
review a document in order to refresh his recollection.
   A. Do you want me to pull the document?
   Q. No, that's fine.
   A. But your firm has the closing binder.
   Q. Okay. What else did the Naftalis talk about at the closing table?
   A. They were extremely pleasant. There was pleasantries passed back and forth. It was a very positive atmosphere.
     They were excited about the sale, they were excited about the opportunity to do the 1031, roll over the money, not pay tax on any gain. Other than that, the little pleasantries specifically I don't recall.
   Q. Do you remember them speaking to each other in Hebrew?
   A. Possibly.
     All their conversations with me were in English on the telephone. All e-mails with me are in English. I don't speak conversational Hebrew.

21 (Pages 81 to 84)

Page 85

J. Wechsler

Q. Do you speak a little bit of Hebrew?
A. I can daven barely, D-A-V-E-N, but no conversational Hebrew.
Q. So you testified earlier that Joseph Taplitzky brought on for the first time the Naftalis using a 1031 exchange, correct?
A. In the closing table, yes.
Q. At the closing table?
A. True.
Q. Did Joseph Taplitzky bring it up to you at any point prior to the closing table that the Naftalis would like to use a 1031 exchange?
A. Possibly. I don't recall.
Q. Who asked you whether the Naftalis could utilize a 1031 exchange as part of this transaction?
   MR. SEIDEN: At the closing table?
   MR. COHEN: At the closing table.
A. Joseph brought it up, then I discussed it with Joseph, Ora and Roni Naftali.
Q. What did you say?

Page 86

J. Wechsler

A. Well, basically they advised me it was investment property that was a rental real estate property, and which I had already known because I had a copy of the lease.
   So basically I knew it was a rental property so it was used for business purposes so it qualified and at that time then we could do a 1031. I called Fritz to make sure we could do the 1031 because we were sitting at the closing table.
Q. When you had the conversation about the 1031 exchange with Joseph and the Naftalis were checks already made payable to the trust?
A. Yes, correct.
Q. What else did you explain to the Naftalis about a 1031 exchange at the closing table?
A. The process of identifying the property, the process of what would be done with the proceeds, that the proceeds instead of going to the Edtom Trust would go to the exchanger, the 1031 exchange company, and it would sit there until the time that you close on the subsequent property.

Page 87

J. Wechsler

So I explained that all to them and I explained to them about then they could -- it's not that you don't pay income tax. That's a misnomer. It's you're basically deferring payment of a tax obligation to New York State and the IRS. You're not paying the tax on the gain at this juncture.
Q. And you advised them that they could still perform a 1031 exchange at that time?
A. Yes. Because what I did, I just told you, I called Fritz from NYDEC -- who is amazing -- and he said, "Yes, you could still perform this," correct.
Q. Before calling Fritz, did you tell them they could perform a 1031 exchange at the closing?
A. I said I needed to check with Fritz from NYDEC. So I confirmed with him that I could still do it.
Q. Why did you need to check with Fritz?
A. Because we're sitting at a closing table. I didn't have the exchange forms. I

Page 88

J. Wechsler

didn't have anything that I would normally prepare to do a 1031. Fritz's office prepares -- the NYDEC prepares all these forms that I need that are in the closing binder, of which you have a copy.
Q. Did you have any reason to believe that it was no longer possible to utilize a 1031 exchange as part of the sale transaction?
   MR. SEIDEN: Objection to form.
A. Hence my phone call to Fritz to confirm if I could do it or not, okay? So he said that I could do it.
   And it's an irrelevant question because they didn't go forward even though they identified a property, which was in their depositions. When they gave the deposition, they did have -- identify property. They chose not to move forward.
   So the whole question that you're giving me about a 1031 is totally irrelevant today because they chose not to go forward. That means that then we did have to pay the tax and the taxes had to be paid on a timely basis. The taxes were sent in on April of

22 (Pages 85 to 88)

Page 89

J. Wechsler

2015 -- April 15th of 2015 to avoid penalty.

So the relevance of the 1031, whether the checks were down on the table or picked or the form was done, everything was done that business day. So everything was done on October 10, 2014.

So the questions about the 1031 at this point don't matter because they decided not to go forward after they identified a property. It was the $4.2 million property in the Time Warner Center and they chose not to move forward.

Q. Before you called Fritz, did you think about anything that -- withdrawn.

So you didn't see a reason why they couldn't perform the process of starting a 1031 exchange?

MR. SEIDEN: Objection to form.

A. Apparently not, because I confirmed it with Fritz, who's amazing, at NYDEC and he does many 1031s.

Q. So you relied upon what he told you?

A. He's an expert. He's amazing. To

Page 90

J. Wechsler

this day, he's amazing.

Q. Did you make any -- did you make your own independent determination about whether the Naftalis and the trust could proceed to utilize a 1031 exchange?

A. I reviewed the whole situation with Fritz at NYDEC and I went through it in detail with him and he said -- I slipped out of the closing to explain it to him and he said yes, I could do it.

So he got me the forms. I think it was Robert maybe in his office. It was either Robert or Fritz, but he sent me the forms and I got the Naftalis to sign everything that day. I had George Bunn sign the exchange form because you need the purchaser to sign the form.

So George had a power of attorney for his client. We gave him back the checks, he gave me new checks. And we had George sign, George Bunn sign the form. And everything was done on the 10th, the date of the closing.

But again it's irrelevant because

Page 91

J. Wechsler

the Naftalis decided not to move forward in a timely manner. They chose not to do the 1031 unilaterally on their own.

Q. Why did you call Fritz? Why did you call NYDEC?

A. Because they are great at doing 1031 exchanges.

Q. You had worked with them in the past prior to the closing in October 2014?

A. Yes.

Q. How many times did you work with them in the past, prior to this date?

A. Numerous times.

Q. More than five?

A. I don't recall the number, but numerous times.

Q. More than ten?

A. I just said I don't recall the number. Don't pigeonhole me.

Q. So you didn't think to call any other 1031 exchange companies?

A. They are an expert in the field.

Q. So no?

A. The answer is "no."

Page 92

J. Wechsler

Q. Have you ever received a referral fee from NYDEC for referring business to them?

A. Once many years ago, a few hundred dollars. I have done work with NYDEC before and after this transaction and no other referral fee. It was a one-time thing, a few hundred dollars, that was it.

Q. Did you expect a referral fee on this transaction?

A. No, of course not.

Q. You testified earlier that you stepped outside of the room where the closing was taking place to call Fritz, correct?

A. Yes.

Q. What did you ask him on your call?

A. What I already told you.

Q. How did you start the call?

A. "Hi." He knows me.

Q. He knows you on a first name basis?

A. Yes.

Q. Who else was on the phone call?

A. It would have been myself and Fritz.

Q. Anybody else?

## Page 93

J. Wechsler

1  A. No.
2  Q. Was Rob on the call?
3  A. No.
4  Q. Did Fritz ask you for any information during your phone call?
5  A. Yes. We exchanged a lot of information.
6  Q. What information did you exchange?
7  A. I told him the whole situation with the contract, that we are sitting at a closing table, the sale was in process, the closing was occurring. I told him the whole thing of paying off a lender. You know, I told him, "I have the clients sitting here." I told him it's a trust. I went through everything with him.
8  I had to send him copies of the documents. So I'm sitting in Corcoran's office, that was Joseph's office. So I don't recall if I asked, and I believe I did quite possibly but I don't recall exactly, but I probably would have had Joseph just scan documents or just off of my phone I sent him documents I had saved so he could see it, so

## Page 94

J. Wechsler

he could confirm whether or not I could do it.
Q. Did you tell him the trustees were foreigners?
    MR. SEIDEN: Objection to form.
A. I gave him the information that I had.
Q. Did you tell him that checks had been cut into -- payable to the Edtom Trust?
A. Correct.
Q. You did tell him that?
A. Yes.
Q. And Fritz told you that the Naftalis could still perform a valid 1031 exchange?
    MR. FERLAZZO: Objection.
A. That was my understanding and belief, correct.
Q. And you agreed with him?
A. Restate your question.
Q. Did you agree with -- withdrawn.
A. Okay.
Q. After speaking to him you agreed -- you agreed that the Naftalis could perform a valid 1031 exchange?

## Page 95

J. Wechsler

    MR. SEIDEN: Objection to form.
A. When you say "him"?
Q. Fritz.
A. Correct, yes.
Q. How did you end the call?
A. That there was probably a few calls because then I spoke to Naftali. They confirmed they wanted to move forward. So I probably -- probably would have called Fritz back possibly. There might have been another call to say, "Yes, we will go forward," and that I need the forms to do the 1031 that are in my closing package which you have.
Q. So you told the Naftalis about your initial conversation with Fritz?
A. Of course.
Q. And they told you they wanted to go forward with the 1031 exchange?
A. Yes.
Q. Did you -- did you -- after these conversations, did you discuss performing a 1031 exchange with the title closer?
    I'll withdraw.
    Did you inform the buyer's counsel

## Page 96

J. Wechsler

that the Naftalis wanted to proceed with a 1031 exchange at the closing?
A. With George Bunn, yes.
Q. You did? You told him?
A. Yes, "him" being George Bunn who was the purchaser's attorney.
Q. Did he have anything to say in response?
A. He was super-nice. He was very helpful, "whatever you need to get done." And he was willing to sign the 1031 exchange forms, switch out checks, whatever we needed to do.
    MR. COHEN: I would like to introduce the next exhibit which is being marked as Plaintiffs' G. It starts with Bates stamp number Naftali-00011 and ends on Naftali-00017.
    (Plaintiffs' Exhibit G, pages Bates stamped NAFTALI-00011 to NAFTALI-00017, marked for identification, as of this date.)
Q. If you would review the document that's in front of you and let me know when you're ready for questions, Mr. Wechsler.

24 (Pages 93 to 96)

|  | 97 |
|---|---|
|  | J. Wechsler |

1  J. Wechsler
2  (Recess taken 12:10 p.m.)
3  (Resumed at 12:27 p.m.)
4  Q. Mr. Wechsler, have you reviewed
5  Plaintiffs' G?
6  A. Yes. And there's a duplicate check
7  I just want you to note on the record, on
8  page 14 and page 17. It's photocopied twice.
9  Q. Do you recognize these checks?
10 A. Yes.
11 Q. What do you recognize these checks
12 to be?
13 A. These were checks -- contract
14 deposit check was the first one on page
15 Naftali-00011. There was a contract deposit
16 for 390.
17 Q. Were these checks that were issued
18 at the closing?
19 A. Yes.
20    The first one was not, that's why I
21 referenced that.
22 Q. Okay. So the closing ended,
23 transaction was closed. Everyone left the
24 closing table?
25 A. Yes, but you are missing checks.

98

1  J. Wechsler
2  Q. We are missing checks?
3  A. You don't have all the checks here.
4  Q. What checks are missing?
5  A. The checks to NYDEC.
6  Q. The checks to NYDEC were issued at
7  the closing table?
8  A. They were issued subsequent to the
9  closing table because then we adjourned so we
10 could finish the 1031 exchange that I
11 explained to you earlier because we needed to
12 get the forms.
13    So we adjourned, and we needed to
14 get the forms so I could have George sign it
15 so I can have the client sign them and then to
16 exchange the checks.
17 Q. You say that the closing was
18 adjourned. Did you take a copy of the deed
19 from the closing table?
20 A. No. The title closer held it in
21 escrow.
22 Q. Did you have an escrow agreement
23 with the title closer?
24 A. No. It's just a verbal
25 understanding, holding it.

99

1  J. Wechsler
2  Q. Did you issue any e-mails
3  adjourning the closing?
4  A. No. We're all sitting there. It
5  was a little more informal than what you're
6  saying. No.
7  Q. Is there any document to evidence
8  an adjournment of the closing?
9  A. The evidence is that we have checks
10 that you don't have in this package that your
11 firm has and it was part of my closing package
12 and your firm has it. And you've kept those
13 out. So similar to your Exhibit B, where you
14 put in extra W-7s that were not part of that
15 e-mail, now you're leaving checks out on this
16 attachment.
17 Q. Did the Naftalis leave with checks
18 in their hand from the closing table?
19 A. Probably yes, they left with the
20 checks, and then I got them back when we got
21 the forms to sign for NYDEC.
22 Q. Did you see them leave with the
23 checks in their hand?
24 A. I don't recall, but most likely
25 yes, probably they left the checks -- they

100

1  J. Wechsler
2  took the checks probably and gave them back to
3  me.
4  Q. Do you know where they went after
5  the closing?
6  A. I have no idea.
7  Q. Did they leave with Joseph
8  Taplitzky?
9  A. I doubt it. It was his office so I
10 don't think he left with them, but possibly.
11 Who knows? I know that they have a close
12 relationship, or had.
13 Q. What did you do when you left the
14 closing? Where did you go?
15 A. I went back to my office.
16    MR. COHEN: If I could take back
17 Plaintiffs' G from you, please.
18    (Witness handing document.)
19 Q. When you go back to your office
20 after the closing, did you copy the checks
21 from the closing? Did you make copies of the
22 checks?
23 A. The checks in your last exhibit?
24 Q. No, I'm just saying --
25    What did you do when you got back

25 (Pages 97 to 100)

The Little Reporting Company
(646) 650-5055 | www.littlereporting.com

265

J. Wechsler

Q. When you refer to doing transactions with NYDEC, are you referring to 1031 exchanges?

A. I apologize. Yes, 1031 exchanges. My client was the seller of a transaction and different transactions, and we would park the money with NYDEC.

Q. Can you approximate how many 1031 exchange transactions you have done involving NYDEC?

A. NYDEC? No. I wouldn't know because I've been doing real estate transactions since 1998, so I can't give you a number.

Q. Did the Naftalis ever tell you that Mr. Taplitzky was their agent?

A. Did they use the word "agent"? They referred to him as "just go to Joseph Taplitzky to get" what he needed all the time. So they always used him as the point person.

Q. I believe you testified earlier that Mr. Taplitzky told you he would get you the tax identification number for the trust and you did not get it and you saw that as a

266

J. Wechsler

problem; is that right?

A. Correct.

Q. When did you first see that as a problem?

A. Early on I was asking for taxpayer ID numbers and that was today I think in Exhibit B, I think.

And so that was at the very beginning, before the contract was even written, I was asking for taxpayer ID numbers. And in Exhibit B, that's where Joseph said that he would be providing it to me.

Q. But do you recall the general time frame when you thought the fact that you were not being provided with a tax identification number was a problem?

A. Correct. And then basically they kept saying they would have it for the closing and I didn't get it. So then when they had prepared -- when I had the abstract company prepare the ACRIS docs, they would prepare it just with all 9s and they would prepare it subsequently when they would give me the ID number which I thought they had.

267

J. Wechsler

Q. I believe you testified earlier that you thought the Naftalis were using the other unit, I think it was 43-U, as a residence; is that right?

A. In the same building, correct, yes.

Q. Do you recall how you came to have that understanding?

A. Through Joseph and also through Naftalis, because they said that they were using the unit.

Q. Was that an understanding you had prior to the closing?

A. Correct.

Q. Do you recall if there came a point when you learned that they were not using unit 43-U as a residence?

A. Yes.

Q. When was that? And again, general time frame is fine if you can't remember specifics.

A. Ora and Roni Naftali's depositions. That's when I learned that that was used as rental property. And also then, and which was supported by the tax returns that we got from

268

J. Wechsler

them, which basically when I read through the tax returns which we got just prior to the depositions.

And if you read it, they struck out a lot of things, but there was 43-UI in there as rental income, and that was the first time that I saw 43-U was rental property, was the tax returns and they confirmed that during the depositions.

So it was the tax returns which we got, I don't know, maybe a week prior approximately to their depositions.

Q. Now, again, I believe you testified earlier that at the closing you stepped out to call Mr. Trinklein. Is that right?

A. Yes.

Q. Do you recall approximately how long that call took?

A. Seven minutes. I explained the whole situation to him, which I mentioned earlier about that we are in the process of a closing, can this be done? And I walked him through everything. So --

Q. When you say you walked him through

269

J. Wechsler
1  everything, what do you mean?
2      A.  That we are physically sitting at a
3  closing, that the seller is a trust.
4      So I explained those items to him.
5  I told him it's a condo.  I told him -- I gave
6  him numbers.  So I knew what I was talking
7  about, that I was paying off a mortgage at the
8  closing table.  So he had some sort of idea of
9  how much I was going to be transferring in to
10 do a 1031 exchange.
11     Q.  Do you recall anything else you
12 told him?
13     A.  No.  What we talked about was about
14 getting the documents and getting everything
15 done for October 10th.
16     Q.  Do you recall any questions he
17 asked you?
18     A.  Not specific questions.  We were
19 just -- we went through the whole transaction
20 and where I was, and that I was at the closing
21 and they decided that.
22     Q.  Prior to your stepping out at the
23 closing to call Mr. Trinklein, had the checks
24 been cut?

270

J. Wechsler
1      A.  The answer would be yes, because
2  basically they were bank checks and George's
3  check was actually dated on October 9th, and
4  he went to Citibank for his escrow account.
5  And mine was probably dated the 10th because I
6  usually try and do it the same day.  But since
7  it was a morning closing, I might have done it
8  on the 9th.
9      Q.  Had any of the checks that were
10 payable to the trust been handed over to the
11 Naftalis prior to your leaving to make the
12 call to Mr. Trinklein?
13     A.  They were doubtful prior to me
14 making the phone call because basically the
15 checks were sitting on the table and the title
16 company -- title closer would have had to make
17 copies.  And the closing wasn't complete, so I
18 wouldn't have handed checks to a client until
19 closing is -- you know, like toward the end.
20     Q.  During your call with Mr. Trinklein
21 when you had stepped out at the closing, did
22 you tell him the checks had been cut?
23     A.  Yes.  So I had to disclose
24 everything to him.

271

J. Wechsler
1      So I mean we were working on the
2  same team to try and facilitate a 1031 for a
3  client.  So he has to know everything.  He has
4  to know I'm at the closing, he has to know I
5  have the deed, there is checks on the table.
6  I have to tell him everything.
7      Q.  Did you tell him the checks were
8  payable to do the trust?
9      A.  I don't know if I said trust or
10 client, but yeah.
11     Q.  What, if anything, did he say in
12 response to that?
13     A.  We talked about exchanging the
14 checks.
15     Q.  I believe you think you had other
16 calls with Mr. Trinklein during the course of
17 the day on October 10, 2014.
18     A.  Yes.
19     Q.  Do you recall approximately how
20 many?
21     A.  No.  It was at least one call,
22 maybe two calls, and it might have been with
23 him or with Rob at his office.
24     Q.  Do you recall what was discussed

272

J. Wechsler
1  during those calls?
2      A.  Obtaining the documents to do a
3  1031 exchange and getting them executed that
4  day.  That was pretty much it.
5      Q.  On the 10th did you provide any
6  documents to Mr. Trinklein or anyone else at
7  NYDEC?
8      A.  They probably would have been
9  faxed.  Or, I'm sorry, faxed or e-mails from
10 my office.  But the originals were going to be
11 FedEx'd.
12         MR. FERLAZZO:  Let's mark this as
13     Defendants' Exhibit 33, please.
14         (Defendants' Exhibit 33, pages Bates
15     stamped JWL000905 to JWL000922, marked for
16     identification, as of this date.)
17     Q.  Mr. Wechsler, I ask you to take a
18 look at what we have marked as Defendants'
19 Exhibit 33.  It is an e-mail dated October 10,
20 2014 with attachment.  The document bears the
21 Bates stamps JWL-905 to -922.
22     Could you just let me know after
23 you've had a chance to take a look at it.
24     A.  Ready.