UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ORA NAFTALI and RONI NAFTALI, AS
TRUSTEES OF THE EDTOM TRUST DATED
APRIL 10, 2011,

                 Plaintiffs,

      -against-

NEW YORK DEFERRED EXCHANGE CORP.,
*et al.*,

                Defendants.
-------------------------------------------------------------X

**REPORT AND RECOMMENDATION**
15-CV-07152 (JMA) (JMW)

**WICKS,** Magistrate Judge:

      Benjamin Franklin long ago observed that "in this world, nothing is certain except death and taxes." However, even taxes are not so certain, particularly when a Section 1031 "like-kind exchange" is utilized, which allows taxpayers to avoid paying capital gains tax when selling one piece of investment or business-related real property for another.

      Plaintiffs, who are trustees and beneficiaries of the Edtom Trust, sought to use this device in connection with the sale of their Manhattan apartment. To facilitate this nuanced tax transaction, Plaintiffs engaged Defendant New York Deferred Exchange Corp. ("NYDEC")—a corporation in the very business of assisting taxpayers with 1031 Exchanges—to act as their Qualified Intermediary ("QI") in the Exchange. Needless to say, the Exchange failed, forcing Plaintiffs to spend approximately $300,000 in fees associated with rectifying issues with the IRS, denying them of any interest they would have otherwise realized on the funds, and ultimately prompting them to commence this lawsuit against Defendant NYDEC[1] alleging, *inter alia*, breach of contract, negligence, and conversion.[2]

      Before the Court on referral from the Honorable Joan M. Azrack is Defendant NYDEC's motion for summary judgment seeking to dismiss Plaintiffs' breach of contract, negligence, and conversion claims

---

[1] Although there are additional Defendants in this matter, none of them joined in or are affected by the present motion.
[2] Plaintiffs also asserted claims against NYDEC for injunctive relief, an accounting, and to pierce the corporate veil, all of which were dismissed at the 12(b)(6) stage of this proceeding. (DE 31, 34.)

against it. (DE 84.) Plaintiffs oppose Defendant's motion in its entirety. (DE 85.) For the reasons that follow, the undersigned respectfully recommends that (1) Defendant's motion for summary judgment as to Plaintiffs' breach of contract claim be denied; (2) Defendant's motion for summary judgment as to Plaintiffs' negligence claim be granted in part and denied in part; and (3) Defendant's motion to summary judgment as to Plaintiffs' conversion claim be granted.

## I. RELEVANT BACKGROUND

### A. Section 1031 Exchanges

Before delving into the factual underpinnings of this case, the Court will briefly describe the mechanics of a Section 1031 Exchange, the tax vehicle at the core of this lawsuit. If properly executed, 1031 Exchanges shield taxpayers from paying taxes on gains realized from the sale of certain real property.[3] 26 U.S.C. Section 1031(a) provides that

> [n]o gain or loss shall be recognized on the exchange of real property held for productive use in a trade or business or for investment if such real property is exchanged solely for real property of like kind which is to be held either for productive use in a trade or business or for investment.

26 U.S.C. § 1031(a)(1). Stated differently, the statute protects taxpayers selling business or investment property in exchange for other business or investment property. It does not, on the other hand, protect taxpayers in selling or purchasing personal property. *See id.* Notably, 1031 Exchanges also allow purchasers who acquire property from foreign individuals to avoid acting as a "withholding agent" responsible for withholding—at the time relevant to this action—ten percent of the purchase price to ensure that any taxable gain realized by a foreign transferor is actually paid.[4] *See, e.g.*, 26 U.S.C. § 1145 (2008), *amended by* 26 U.S.C. § 1145 (2017) (increasing withholding tax requirement from ten to fifteen percent).

Although seemingly straightforward based on its prefatory provision, the statute goes on to a list a series of requirements taxpayers must satisfy to realize the tax benefits. Notably, the taxpayer must identify the property to be acquired in the 1031 Exchange within forty-five days of relinquishing his or her property.

---

[3] Under the Internal Revenue Code, taxable gross income includes "[g]ains derived from dealings in property." 26 U.S.C. § 61.
[4] This is commonly known as a Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA") withholding tax.

26 U.S.C. § 1031(a)(3)(A). Moreover, the taxpayer must receive the acquired property at the earlier of (1) one hundred and eighty days after selling the relinquished property; or (2) the date of the taxpayer's return for the tax year he or she relinquished the property. 26 U.S.C. § 1031(a)(3)(B).

The relevant regulations push further and—importantly for the present case—forbid the taxpayer from receiving sale proceeds, either actually or constructively, as consideration for taking part in the 1031 Exchange. Treas. Reg. § 1.1031(k)-1(a). Taxpayers therefore may not receive sale proceeds of relinquished property at any point, lest they lose the benefits of the 1031 Exchange. To avoid this pitfall, taxpayers must ordinarily enter an "exchange agreement" with a QI who acts on the taxpayer's behalf to (1) acquire the relinquished property from the taxpayer; (2) transfer the relinquished property and secure the proceeds from the sale; (3) acquire the replacement property; and (4) transfer the replacement property to the taxpayer.[5] Although the taxpayer, under such circumstances, technically attains constructive possession of the sale proceeds through the QI, the tax regulations carve out and permit transactions involving QIs for the purposes of effectuating a 1031 Exchange. Treas. Reg. § 1.1031(k)-1(g)(4) ("[T]he determination of whether the taxpayer is an actual or constructive receipt of money or other property before the taxpayer actually receives like-kind replacement property is made as if the [QI] is not the agent of the taxpayer."). In short, QIs play an integral role in ensuring 1031 Exchanges are properly carried out.

### B. Plaintiffs Attempt a 1031 Exchange

Plaintiffs are citizens of Israel and have never been citizens of the United States. (DE 84-1 at 2.) On April 10, 2011, Plaintiffs established and became trustees and beneficiaries of the Edtom Trust. (*Id.*) The Trust is considered a "foreign person" under applicable law. (*Id.* at 4.) Plaintiffs used the Trust to purchase an apartment located at 322 West 57th Street in New York City. (*Id.* at 2–3.) From the time of its purchase on May 5, 2011, Plaintiffs utilized the apartment strictly for investment purposes as rental property. (*Id.* at 3.)

---

[5] *See* Matthew D. Haydo, *Qualified Intermediaries and the Taxpayers Who Trust Them: The Case of the Like-Kind Exchanger with Nothing to Exchange*, 46 Duq. L. Rev. 493, 500 (2008).

Plaintiffs sought to sell the apartment at some point in 2014. They eventually found an appropriate buyer who agreed to purchase the apartment from the Trust for $3,950,000.00 and, on October 10, 2014, attended the apartment's closing. (*Id.*) Defendant Weschler—an attorney and certified public accountant—represented Plaintiffs in the sale and was present at the closing. (*Id.* at 4.) Because the Trust faced possible tax consequences stemming from the sale—including capital gains tax and FIRTPA withholding tax—Defendant Weschler informed Plaintiffs at the closing table of the possibility of avoiding or limiting such tax liability by way of a 1031 Exchange. (*Id.* at 3–4.) With the prospect of saving money on mind, Plaintiffs agreed to utilize the 1031 Exchange. (DE 84-15 at 5.) To facilitate the transaction on behalf of Plaintiffs, Defendant Weschler called Defendant Trinklein—President of Defendant NYDEC—and asked if Defendant NYDEC would act as the QI for Plaintiffs' contemplated 1031 Exchange, to which Defendant Trinklein ultimately replied that it would. (DE 84-1 at 4.) The parties dispute whether, at the time of phone call, the buyer had given Plaintiffs the check for the sale proceeds of the apartment. (*Compare id. with* DE 85-1 at 2–3.) The parties further dispute whether Defendant NYDEC ever knew or understood during the relevant period that Plaintiffs came into possession of this check. (*Compare* DE 84-1 at 4 *with* DE 85-1 at 2–3.)

Later that day, Plaintiffs entered into an Exchange Agreement with Defendant NYDEC in the hopes of effectuating the 1031 Exchange. (DE 84-1 at 5.) Under the terms of the Agreement, Defendant NYDEC agreed to act as the QI for Plaintiffs' 1031 Exchange. (DE 84-5.) The Exchange Agreement details the responsibilities of each party as required to effectuate a valid 1031 Exchange as outlined above. (*See, e.g.*, *id.*; *see also supra* Section I.A.) The Agreement provides that "[Defendant NYDEC] makes no guarantee, promise or other representation with respect to the validity, viability or qualification of this transaction for IRC Section 1031," and that the "issuance of checks (except for checks issued by [Defendant NYDEC]), have been made and will be made by [Plaintiffs] or [their] Counsel without verification or validation by [Defendant NYDEC]." (*Id.* at 8.) Plaintiffs agreed that "[a]s additional consideration for [Defendant NYDEC's] acquisition and transfer of acquired property to [Plaintiffs], [Defendant NYDEC] shall receive a fee from [Plaintiffs] in the sum of $3,100.00." (*Id.* at 10.) In the event the 1031 Exchange fails, the

4

Agreement requires that Defendant NYDEC pay any amount of money remaining in escrow to Plaintiffs. (*Id.* at 7.) The Agreement also contains the following provision:

> [Plaintiffs] hereby agree[] under penalties of perjury that [Plaintiffs] [are] not . . . "Foreign Person[s]" as defined by Section 1445 of the Internal Revenue Code and the regulations promulgated thereunder, that [Plaintiffs'] United States taxpayer identification number is _____ and that [Plaintiffs'] address is 322 West 57th Street, Apartment 42UI, New York, New York 10019 and that [Plaintiffs] [are] not subject to backup withholding.

(*Id.*) Although Plaintiffs executed the Agreement, they did not provide a taxpayer identification number ("TIN"), leaving a lacuna in the above provision (*id.*) because Plaintiffs and the Trust were foreign persons and therefore did not have a TIN, social security number, or employment identification number at the time (DE 84-1 at 5; DE 85-1 at 3).

After executing the Exchange Agreement, the sale proceeds were transferred to Defendant NYDEC. (DE 84-1 at 5.) On November 18, 2014, Defendant Wechsler emailed Defendant NYDEC stating that Plaintiffs no longer wished to move forward with the 1031 Exchange. (DE 84-6.) However, Plaintiffs reversed course and, on December 9, 2014, Defendant Wechsler again emailed Defendant NYDEC, now explaining that Plaintiffs had identified replacement property. (DE 84-7 at 3.) Defendant NYDEC responded that Plaintiffs "ha[d] the full 180-day period to effectuate the exchange." (*Id.*)

Defendant NYDEC then reached out to Defendant Weschler on December 23, 2014 and inquired about the "status of obtaining [Plaintiffs'] TIN." (DE 84-8 at 2.) Defendant Weschler responded that he was "in the process of trying to obtain the TIN's [*sic*] from the IRS." (*Id.* at 3.) According to Defendant NYDEC, the exchange period expired on April 8, 2015. (DE 84-2 at 11.) Since the purchaser had not withheld ten percent of the sale proceeds, Defendant NYDEC became concerned that it may be responsible for paying the FIRPTA withholding tax and filing the associated forms (DE 84-13 at 8–9) and was in fact responsible for handling these matters for Plaintiffs (DE 84-1 at 5; DE 85-1 at 3). On April 10, 2015, Defendant NYDEC filed a Form 8288 and paid the FIRPTA withholding tax to the IRS. (DE 84-1 at 6.) The parties dispute whether Defendant NYDEC made these filings with Plaintiffs' consent. (*Compare id.*

5

*with* DE 85-1 at 4.) Plaintiffs contend that Defendant negligently filed the Form 8288 by misreporting the transfer date of the apartment as April 8, 2015 rather than October 10, 2014. (DE 85 at 15.)

Despite filing the Form 8288 and paying the FIRPTA withholding tax, Defendant NYDEC remained troubled that it faced potential liability if the IRS determined that the filing and payment were done late. (DE 84-13 at 14–16.) As a result, Defendant NYDEC discussed with Plaintiffs the possibility of returning "a vast majority of the remaining proceeds to them and holding a small portion of the [p]roceeds in escrow." (DE 84-1 at 6.) In the midst of those negotiations, Plaintiffs filed the instant lawsuit.

## II.    PROCEDURAL HISTORY

Plaintiffs commenced this action against Defendants NYDEC and Trinklein on December 16, 2015. (DE 1.) Plaintiffs then amended their complaint and added Defendant Weschler to the matter. (DE 15.) While Defendant Weschler filed an answer to the amended complaint, Defendants NYDEC and Trinklein moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[6] (DE 24.) The Honorable Joan M. Azarck then referred that motion to the Honorable Arlene R. Lindsay for a Report and Recommendation. (Electronic Order dated Mar. 16, 2017.) In her Report and Recommendation, Judge Lindsay recommended that the district court (1) dismiss Plaintiffs' claims against Defendant Trinklein; and (2) dismiss Plaintiffs' claims against Defendant NYDEC for an injunction, accounting and veil piercing, but allow Plaintiffs' claims for breach of contract, negligence, and conversion to proceed. (DE 31.) Judge Azrack subsequently adopted that Report and Recommendation in its entirety. (DE 34.)

Following the resolution of the 12(b)(6) motion, Defendant NYDEC filed an answer and asserted a host of counterclaims and third-party claims against Plaintiffs. (DE 35.) Plaintiffs then filed a crossclaim against Defendant Weschler and a counterclaim against Defendant NYDEC. (DE 45.) Finally, Defendant

---

[6] On January 5, 2016, after Defendants filed their motion to dismiss, the parties entered into an agreement whereby Defendant NYDEC agreed to remit $1,104,199.64 of the sale proceeds to Plaintiffs and transfer the remaining $200,000.00 to Plaintiffs' Counsel, as escrow agent, "until there is an adjudication determining the disbursement of the balance of the escrow in the action or a further agreement of both the Plaintiff[s] and Defendants." (DE 84-11 at 2–3 (capitalization altered).)

Weschler asserted a third-party claim against Third-Party Defendant Taplinksy, who had acted as Plaintiffs' real estate agent throughout the relevant period. (DE 48.)

The parties have completed discovery and have filed a proposed joint pre-trial order. (DE 74.) On July 1, 2021, Defendant NYDEC filed the present motion for summary judgment seeking to dismiss Plaintiffs' remaining claims of breach of contract, negligence, and conversion. (DE 84.) Plaintiffs, of course, oppose that motion in its entirety. (DE 85.) On October 22, 2021, Judge Azrack referred the present motion to the undersigned for a Report and Recommendation. (Electronic Order dated Oct. 22, 2021.)

### III.  DISCUSSION

Defendant NYDEC seeks summary judgment and dismissal on Plaintiffs' breach of contract, negligence, and conversion claims. Plaintiffs resist and contend that each claim presents issues of fact that must move on to trial. The Court discusses each claim in turn.

#### A. Breach of Contract

To recover for breach of contract in New York, a plaintiff must prove (1) the existence of a contract between itself and the defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by the defendant; and (4) damages to the plaintiff caused by defendant's breach. *Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (citations omitted); *see Harte v. Ocwen Fin. Corp.*, No. 13-CV-5410 (MKB), 2014 WL 4677120, at *4 (E.D.N.Y. Sept. 19, 2014). In interpreting a contract to determine whether a breach has occurred, "words and phrases . . . should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (internal quotation marks omitted).

A party's performance under a contract will be excused "where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). "For a breach to be material, it must go to the root of the agreement between the parties." *Progress Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016) (internal quotation marks and citations omitted).

7

On the other hand, a breach is not material if the breaching party has substantially performed its end of the contract. *Barbagallo v. Marcum LLP*, 925 F. Supp. 2d 275, 287 (E.D.N.Y. 2013). In such instances, the aggrieved party is not excused from its performance obligations. *Id.* Courts typically consider five factors in determining whether a failure to perform constitutes a material breach, namely

      (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

      (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

      (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

      (d) the likelihood that the party failing to perform or to offer to perform, taking account of all the circumstances including any reasonable assurances; [and]

      (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standard of good faith and fair dealing.

*Bear, Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.*, 361 F. Supp. 2d 283, 298 (S.D.N.Y. 2005) (quoting Restatement (Second) of Contracts § 241 (Am. Law Inst. 1981)); *accord Hadden v. Consol. Edison Co. of N.Y., Inc.*, 34 N.Y.2d 88, 96, 312 N.E.2d 445, 449, 356 N.Y.S.2d 249, 255 (1974). Notably, the issue of materiality often involves "a question of fact and should be decided as a matter of law only where the inferences are certain." *Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015) (internal quotation marks and citation omitted); *see Bear, Stearns Funding, Inc.*, 361 F. Supp. 2d at 298 (S.D.N.Y. 2005) ("The application of each of [the factors for a material breach] requires fact-intensive analysis not appropriate for summary disposition."); *Merrill Lynch & Co., Inc.*, 500 F.3d at 186.

Summary judgment disposing of Plaintiff's breach of contract claim is inappropriate given the presence of genuine issues of material fact. Defendant first contends that Plaintiffs materially breached the Exchange Agreement by failing to pay Defendant $3,100.00 for acting as the QI. (DE 84-2 at 14.) In doing so, however, Defendant misinterprets the plain meaning of the Exchange Agreement, which states that, "[a]s additional consideration for [Defendant's] *acquisition and transfer of Acquired Property to* [*Plaintiffs*], [Defendant] shall receive from [Plaintiffs] in the sum of $3,100.00." (DE 84-5 at 10 (emphasis

8

added).)  The provision makes clear that Defendant was required to acquire and transfer the replacement property to Plaintiffs as a precondition to being paid the $3,100.00 fee.  It is undisputed that Defendant never completed the exchange by acquiring and transferring the replacement property to Plaintiffs (DE 84-2 at 11), precluding Defendant's entitlement to the fee.  Plaintiffs could not have breached, let alone materially breached, the Agreement by failing to pay a fee that they were not required to pay.

In support of its interpretation of the Exchange Agreement, Defendant argues that "interpreting the introductory clause as creating a condition to payment of the fee would lead to the commercially unreasonable result where [Defendant] would not be paid a fee for acting as QI if the seller, like Plaintiffs, never complete the exchange."  (DE 84-19 at 6.)  This argument conveniently ignores the fact that Defendant, under the Agreement, receives "a financial benefit" from the bank where Plaintiffs' funds are maintained for the pendency of the exchange.  (DE 84-5 at 10.)  Unlike the $3,100.00 acquisition and transfer fee, Defendant receives this "financial benefit" regardless if the exchange is ultimately effectuated.  Contrary to Defendant's contentions,[7] this outcome cannot be said to be "commercially unreasonable" (DE 84-19 at 6), and therefore does not compel the Court's adoption of Defendant's interpretation of the Agreement.  Indeed, Defendant's bank—Sterling National Bank—paid Defendant for depositing Plaintiff's sale proceeds with it rather than a different bank.  (DE 85-12 at 9.)  In short, Plaintiffs had no obligation to pay the $3,100.00 fee under the terms of the Agreement and, as such, Defendant cannot succeed on its motion for summary judgment for Plaintiffs' breach of a material term in that respect.

---

[7] Defendant relies on *Cole v. Macklowe*, 99 A.D.3d 595, 953 N.Y.S.2d 21 (1st Dep't 2012) in arguing that Plaintiffs' interpretation of the Exchange Agreement would inappropriately lead to a commercially unreasonable result. (DE 84-19 at 6.)  The contract at issue in *Cole* was a limited partnership agreement between plaintiff and defendant that provided, in the event of plaintiff's termination, a ninety-day window for a sales transaction of plaintiff's partnership interest to occur.  *Id.* at 595.  Defendants asserted that, because plaintiff had been terminated and did not sell his partnership interest within the allotted timeframe, he should have been divested of his partnership interest.  *Id.* at 596.  The court disagreed, noting that, in addition to the agreement being devoid of language mandating such an outcome, defendant's interpretation would have "produce[d] an absurd result, one that [was] commercially unreasonable, or one that [was] contrary to the intent of the parties," namely because defendants would have enjoyed the windfall of not having to pay for plaintiff's partnership interest.  *Id.*  The present case is readily distinguishable.  As discussed above, a plain reading of the Exchange Agreement dictates that Defendant may only be paid if it completes the 1031 Exchange on Plaintiff's behalf.  Because the Exchange was never fully consummated, Defendant is not entitled to the fee.  Moreover, a windfall similar to that in *Cole* does not exist here—Plaintiffs have not run off with their bargained-for benefit (the 1031 tax-break) without paying Defendant its fee because the Exchange never occurred.  As such, Plaintiffs' interpretation of the Exchange Agreements is not "commercially unreasonable" under *Cole*.

Defendant also argues that it is entitled to summary judgment on Plaintiffs' breach of contract claim because Plaintiffs materially breached the Exchange Agreement by failing to provide a TIN. (DE 84-2 at 14.) Although it is undisputed that Plaintiffs did not include a TIN on the executed Exchange Agreement (DE 84-5 at 10), a genuine issue of material fact exists as to whether Plaintiffs' failure to provide the TIN—either when they initially executed the Agreement or any point thereafter—constitutes a *material* breach of the agreement. On one hand, Defendant Trinklein testified that Defendant NYDEC does not handle 1031 Exchanges involving foreign individuals without a tax identification number because "[i]t's a complex field that [Defendant NYDEC is] not capable of dealing with." (DE 84-13 at 5.) This, of course, suggests that Plaintiffs' provision of a TIN is a material obligation under the Exchange Agreement. On the other hand, although the Exchange Agreement featured a space for Plaintiffs to include a TIN (DE 84-5 at 10), it is unclear whether the availability of a TIN "go[es] to the root of the [A]greement between the parties." *Progress Am., Inc.*, 839 F.3d at 136. As Plaintiffs highlight, a QI's purpose of obtaining a TIN is to avoid, pursuant to the FIRPTA, withholding agent designation and the responsibility of remitting ten percent of the sale proceeds to the IRS. (DE 85 at 8 n.3 (citing 26 C.F.R. § 1.1445-2).) Thus, even without access to Plaintiffs' TIN, Defendant could have effectuated the exchange and enjoyed the benefits of the Agreement—*i.e.*, the financial benefit from the bank and the QI fee—albeit with the added responsibility of acting as the withholding agent. Moreover, it is undisputed that Defendant reviewed the Exchange Agreement and, despite the absence of Plaintiffs' TIN, accepted the proceeds of sale of the relinquished property. (DE 84-1 at 5.) These facts, when paired with the principle that the issue of materiality often involves "a question of fact and should be decided as a matter of law only where the inferences are certain," *Orlander*, 802 F.3d at 298 (internal quotation marks and citation omitted), create a genuine issue of material fact as to whether Plaintiffs' failure to provide a TIN constitutes a material breach of the Agreement. As such, summary judgment in favor of Defendant is not appropriate based on Plaintiffs' failure to provide a TIN.

Accordingly, the undersigned respectfully recommends that Defendant's motion for summary judgment as to Plaintiffs' breach of contract claim be denied.

### B. Negligence

In New York, the elements of a negligence claim are (1) a duty owed by the defendant to the plaintiffs; (2) breach of that duty; and (3) injury substantially caused by that breach. *Cheeseboro v. Little Richie Bus Servs., Inc.*, 254 F. Supp. 3d 485, 490 (E.D.N.Y. 2017) (quoting *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002)). At issue here is the threshold question of whether Defendant owed a duty to the Plaintiffs in undertaking the 1031 Exchange and filing tax paperwork and paying taxes on Plaintiffs' behalf. "The existence of duty is an essential element of a negligence claim because, '[i]n the absence of a duty, as a matter of law, no liability can ensue.'" *Farash v. Cont'l Airlines, Inc.*, 574 F. Supp. 2d 356, 367 (S.D.N.Y. 2008) (quoting *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997)). Determining the existence and contours "of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration." *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 584, 611 N.Y.S.2d 817, 634 N.E.2d 189 (1994).

New York courts "traditionally fix the duty point by balancing factors, including the reasonable expectations of the parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability." *Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 272 (E.D.N.Y 2014) (internal quotation marks omitted) (citing *532 Madison Ave. Gourmet Foods v. Finlandia Ctr.*, 96 N.Y.2d 280, 288, 727 N.Y.S.2d 49, 750 N.E.2d 1097 (2001)). The breadth of one's duty to another depends on the relationship of the parties, whether the injured party was within the zone of foreseeable harm, and whether that harm fell within a category of reasonably foreseeable harms that the duty exists to prevent. *Id.* (citing *Di Ponzio v. Riordan*, 89 N.Y.2d 578, 583, 657 N.Y.S.2d 377, 679 N.E.2d 616 (1997); *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 344–45, 162 N.E. 99 (1928)).

With these principles at hand, the Court addresses Defendant's arguments that it owed no duty to Plaintiffs in: (1) taking on a 1031 Exchange defective from the outset due to Plaintiffs' receipt of the

11

proceeds from the relinquished property; and (2) filing paperwork and remitting a FIRPTA withholding payment to the IRS.

### i. Defendant Undertaking the 1031 Exchange

Regarding the pre-contractual dealings between the parties and Defendant's willingness to enter into the Exchange Agreement, the Court concludes that Defendant owed no duty to Plaintiffs and that, accordingly, summary judgment is appropriate as to that branch of Defendant's motion. To reiterate, Plaintiffs couch this portion of their negligence argument in the disputed fact that Defendant moved the proceeds of the sale into an escrow account notwithstanding that it knew Plaintiffs initially received these proceeds, foreclosing the possibility of a successful 1031 Exchange. (DE 85 at 24; *see* DE 85-1 at 2–3.) As Defendant points out, there does not appear to be any New York case law recognizing a QI duty to investigate the actions of the taxpayer *prior to* entering an exchange agreement.[8] (DE 84-2 at 15.)

As an initial matter, Plaintiffs' negligence claim concerning the pre-contractual exchange of proceeds appears to be a thinly veiled breach of contract claim. To succeed on a tort claim closely tied to a breach of contract claim in New York, a plaintiff must establish "an independent duty that 'spring[s] from circumstances *extraneous to, and not constituting elements of, the contract*." *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 949 F. Supp. 2d 486, 504 (S.D.N.Y. 2013) (emphasis added) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 390, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987)). Unsurprisingly, the Exchange Agreement here is replete with references Section 1031 of the Internal Revenue Code, and even incorporates by reference all regulations concerning Section 1031 Exchanges. (*See, e.g.*, 84-5; *see also id.* at 5 (incorporating by reference all relevant regulations).) Moreover, the

---

[8] Despite relegating it to a footnote, Plaintiffs rely *Kreisers, Inc. v. First Dakota Ltd. Partnership*—a case decided by the South Dakota Supreme Court—in arguing that QIs should be held to a professional negligence standard and, as such, a pre-contractual duty of care to ensure the viability of a 1031 Exchange may exist. 852 N.W.2d 413, 2014 S.D. 56 (2014). New York courts, however, embrace a far narrower view of who qualifies as a "professional." As the New York Court of Appeals has noted, the qualities that help define "professional" include "extensive formal learning and training, licensure and regulation indicating a qualification to practice, a code of conduct imposing standards beyond those accepted in the marketplace and a system of discipline for violation of those standards." *Chase Sci. Rsch., Inc. v. NIA Grp., Inc.*, 96 N.Y.2d 20, 29, 725 N.Y.S.2d 592, 597, 749 N.E.2d 161, 167 (2001). The record in this matter is wholly lacking any evidence that supports the contention that QIs qualify as professionals in New York. As such, the Court declines to hold Defendant to the standards of a professional, and *Kreisers, Inc.* and South Dakota law therefore have little bearing on the analysis at hand.

Exchange Agreement specifically states that the "issuance of checks (except for checks issued by [Defendant]), have been made and will be made by [Plaintiffs] or [their] Counsel *without verification or validation by* [*Defendant*]. (DE 84-5 at 8 (emphasis added).) As such, any obligations concerning the 1031 Exchange—including the requirement that Plaintiffs not receive the proceeds of the sale—are elements of the Exchange Agreement and therefore do not give rise to the imposition of an independent duty of care on Defendant. *Compare BNP Paribas Mortg. Corp.*, 949 F. Supp. 2d at 518.

Even assuming Plaintiffs' negligence claim is not duplicative of its breach of contract claim, it is clear that—following a review of the factors New York courts consider in assessing the existence of a duty—Defendant owed Plaintiffs no pre-contractual duty of care here. Regarding the reasonable expectations of the parties, although Plaintiffs—who notably were represented by counsel—may have initially relied on Defendant for guidance on the propriety of the 1031 Exchange, the Exchange Agreement, which Plaintiffs executed, makes clear that Defendants cannot be liable for damages, losses, or expenses if the transaction fails *for any reason*. (DE 85-5 at 8.) Having executed the Exchange Agreement on the same day that the apartment sale took place, it strains credulity to say that Plaintiffs—in the face of a broad liability waiver that speaks specifically to the issuance of checks—expected that Defendant owed them a duty of care. If such a duty were imposed on QIs in general, one could easily imagine the proliferation of claims of taxpayers who, as a form of insurance for their 1031 Exchange, briefly receive the proceeds from a sale, immediately pass the proceeds to an agent, and then enter into an exchange agreement with a QI. In such cases, should the 1031 Exchange fail for any reason, the taxpayer could sue the QI for breach of this duty, essentially converting the QI into a 1031 Exchange insurer. This, in turn, would force QIs to engage in costly investigations into whether the taxpayer ever came into the proceeds of the sale. For these reasons, the Court declines to recognize a pre-contractual duty that QIs owe taxpayers.

Accordingly, the undersigned respectfully recommends that summary judgment be granted in favor of Defendant as to the branch of Plaintiffs' negligence claim concerning Defendant's pre-contractual duties.

### ii. Defendant Undertaking Withholding Agent Responsibility

Contrary to Defendant's contentions, the Court concludes that Defendant did have a duty to act with reasonable care when it undertook steps as Plaintiffs' withholding agent by filing a Form 8288 and paying the IRS the FIRPTA withholding tax due. Defendant again highlights that no New York case currently exists establishing a duty under similar circumstances. (DE 84-2 at 16.) However, a balance of the appropriate factors compels the conclusion that Defendant was required to exercise a duty of care here.

At a threshold, the New York Court of Appeals has made clear that "a defendant may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations." *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995). Thus, "anyone who voluntarily assumes a duty can be held liable for negligence in the performance of that duty," even if the undertaking is done so gratuitously. *Morgan Stanley & Co. Inc. v. JP Morgan Chase Bank, N.A.*, 645 F. Supp. 2d 248, 256 (S.D.N.Y. 2009) (quoting *Kaplan v. Dart Towing, Inc.*, 159 A.D.2d 610, 552 N.Y.S.2d 665, 667 (2d Dep't 1990)). The Exchange Agreement here is devoid of *any* terms obligating Defendant to file tax documents or pay withholding taxes on Plaintiffs' behalf. Unlike above, Defendant's affirmative actions—sending tax documents to the IRS and paying taxes on Plaintiffs' behalf—are entirely distinct from its contractual obligations. In asserting their negligence claim, Plaintiffs are therefore not "simply attempting to dress up a contract claim in negligence clothing," *Willow Runs Food Inc. v. New World Rest. Grp.*, No. 3:06-CV-0425, 2006 WL 1228853, at *2 (N.D.N.Y May 4, 2006), but are rather complaining of conduct wholly separate from any of Defendant's duties set forth in the Exchange Agreement. Defendant is thus, at minimum, open to tort liability based on its filing tax documents and paying taxes on Plaintiffs' behalf.

Further, the Court concludes that Defendant did indeed owe Plaintiffs a duty of care under these circumstances. It is well-established in New York that accountants owe clients a professional duty of care in preparing tax documents. *See, e.g.*, *Pennington v. D'Ippolito*, 425 F. Supp. 3d 222, 228–29 (S.D.N.Y. 2019); *Rockman v. Bartlett*, 49 A.D.3d 1072, 1073 (2d Dep't 2008). Although Defendant is not a

14

professional accountant, the existence of a duty in the professional context guides the Court's analysis here. As a matter of policy, it is clear that if a person or entity—like Defendant—takes on the responsibility of submitting tax paperwork and paying taxes on another's behalf, it should be done with reasonable care. The potential financial harm resulting from carelessly preparing such forms is evident and clearly foreseeable. Policy dictates that the law impose a standard of care in such circumstances.

While Defendant may be correct in its narrow assertion that "there is no federal or New York statutory or case law holding that a QI owes a duty to a foreign person with respect to what is included in the FIRPTA withholding tax form," (DE 84-19), the New York Appellate Division's decision in *The Limited, Inc. v. McCrory Corp.* aids the Court's analysis. In *McCrory Corp.*, defendant sold a number of its subsidiaries to plaintiff. 169 A.D.2d 605, 606, 564 N.Y.S.2d 751 (1st Dep't 1991). Prior to the acquisition, defendant allegedly filed franchise tax forms with incorrect information and underpaid the subsidiaries' taxes despite having no contractual obligation to do so. *Id.* Following the acquisition, plaintiff sued defendant for negligence, among other things, after it was forced to pay the associated tax liability along with penalties and interest. *Id.* The Appellate Division, in reversing the trial court's dismissal of plaintiff's negligence claim, noted that a defendant may be liable for negligence when it, outside of its contractual obligations, acts as plaintiff's agent by carelessly preparing tax filings and underpaying taxes. *Id.* at 607. While the parties in the present case dispute whether Defendant filed the Form 8288 with Plaintiffs' consent (DE 85-1 at 4), the *McCrory Corp.* holding supports the conclusion that Defendant owed Plaintiffs' a duty of care in acting as their agent by filing the form and paying the associated taxes.

And Defendant's reliance on *Verizon New York, Inc. v. Optical Communications Group, Inc.* is inapposite. *Verizon New York, Inc.* stands for the proposition that the harm stemming from a breach of contractual obligations may—in the limited circumstances where the public has an interest in ensuring that the terms of the contract be carried out carefully and properly—give rise to independent tort liability. 91 A.D.3d 176, 181–82, 936 N.Y.S.2d 86 (1st Dep't 2011). With this principle in mind, the *Verizon New York Inc.* court made clear that solely financial injury will generally not result in tort liability. *Id.* at 182. Defendant maintains that, under *Verizon New York, Inc.*, Plaintiffs' negligence claim must fail because

15

Plaintiffs seek only economic damages and have not shown that the services performed under the Exchange Agreement are "affected with a significant public interest" and can "have catastrophic consequences" if conducted carelessly. (DE 84-2 at 17 (citing *Verizon New York, Inc.*, 91 A.D.3d at 181).) This argument, however, is premised on the belief that Defendant's duty to act with a reasonable standard of care in filing Plaintiffs' Form 8288 and paying their taxes flows from the terms of the Exchange Agreement. The Court has already dispelled of this contention by concluding that the Exchange Agreement is silent regarding such actions and, as such, *Verizon New York, Inc.* has no bearing here.

Accordingly, the undersigned respectfully recommends that Defendant's motion for summary judgment be denied as to the branch of Plaintiffs' negligence claim concerning Defendant's filing of the Form 8288 and the paying of associated taxes.

\* \* \*

In sum, the undersigned respectfully recommends that (1) summary judgment be granted in favor of Defendant as to the branch of Plaintiffs' negligence claim concerning Defendant's pre-contractual duties; and (2) Defendant's motion for summary judgment be denied as to the branch of Plaintiffs' negligence claim concerning Defendant's filing of the Form 8288 and the filing of associated taxes.

### C. Conversion

Conversion is defined as the "unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (internal quotation marks and citation omitted). To succeed on a conversion claim, New York law requires a plaintiff to show that (1) the defendant acted without authorization; (2) the defendant exercised dominion or a right of ownership of property belonging to plaintiff; (3) the plaintiff made a demand for the property; and (4) defendant refused the demand for the return of the property. *Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.*, 888 F. Supp. 2d 385, 396 (S.D.N.Y. 2012); *see Clark St. Wine & Spirits v. Emporos Sys. Corp.*, 754 F. Supp. 2d 474, 484 (E.D.N.Y. 2010).

Because, as noted above, a breach of contract cannot give rise to tort liability absent additional wrongdoing distinct from the breach of contract, a "conversion action cannot be predicated on an equitable

16

interest or a mere breach of contractual obligation." *Traffix, Inc. v. Herold*, 269 F. Supp. 2d 223, 228 (S.D.N.Y. 2003) (citations omitted); *see also Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) ("[A]n action for conversion cannot be validly maintained where damages are merely being sought for breach of contract. Rather, a plaintiff must show acts that were unlawful or wrongful as opposed to mere violations of contractual rights.") (quotation marks and footnotes omitted). "In determining whether a conversion claim is duplicative of a breach of contract claim, courts look both to the material facts upon which each claim is based and to the alleged injuries for which damages are sought." *LaRoss Partners LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 164–65 (E.D.N.Y. 2012).

  The parties—unsurprisingly—maintain diametrically opposite views on whether Plaintiffs' conversion claim may survive to see trial. Defendant, for its part, contends that Plaintiffs' conversion claim is duplicative of their breach of contract claim because it is merely "based on the assertion that NYDEC 'refused to release' the [p]roceeds to them," and is therefore not grounded in any wrong distinct from the breach of contract claim. (DE 84-2 at 18.) Defendant additionally posits that the conversion claim is deficient because Plaintiffs voluntarily provided the funds at issue to Defendant and that, as such, Defendant never "exercised dominion" over the funds as needed for a conversion claim. (*Id.* at 19.) Plaintiffs retort by asserting that their conversion claim is not duplicative of their breach of contract claim because it is based on a duty independent of those arising out of the contract—*i.e.*, that NYDEC acted as an escrowee for Plaintiffs. (DE 85 at 28.) Plaintiff also adds that Defendant's purported bad faith in exercising control over the funds "justifies pursuing remedies in tort" and thus crystalizes their conversion claim. (*Id.*)

  The Court concludes that Defendant's motion for summary judgment should be granted. At this point in the litigation, Plaintiffs' conversion claim is limited to the $200,000.00 currently held in escrow, which Defendant maintains it withheld to protect itself from potential tax liability. (DE 74 at 6–7.) If Plaintiffs' conversion claim were still comprised the full amount of the net sale proceeds, Defendant would clearly be on solid ground in arguing that the conversion claim is duplicative of the breach of contract claim. This is particularly so given that the Exchange Agreement requires Defendant to immediately remit any proceeds to Plaintiffs in the event of a failed 1031 Exchange. (DE 84-5 at 7.) Thus, any claim associated

17

with the general remittance of the net sale proceeds following the unsuccessful 1031 Exchange is covered by Plaintiffs' breach of contract claim, rendering any conversion claim based on the same facts duplicative. *See Stanley Works Israel Ltd. v. 500 Grp., Inc.*, 332 F. Supp. 3d 488, 514 (D. Conn. Aug. 1, 2018) (dismissing conversion claim that relied on the same facts underlying plaintiff's breach of contract claim because "[t]he money that [was] claimed to be wrongfully retained [was] the same money [p]laintiff claim[ed] was due under the parties' agreement").

It follows that, no matter how Plaintiffs dress it, the $200,000.00 is merely a subset of, and thus duplicative of, the breach of contract damages they seek. It is undisputed that the $200,000.00 is a portion of the net proceeds that Plaintiffs allege Defendant owed them when the 1031 Exchange Agreement deteriorated. Thus, the same facts that support Plaintiffs' breach of contract claim undergird Plaintiffs' conversion claim, *i.e.*, that Defendant breached the express terms of the Exchange Agreement by failing to return the net proceeds. It is of no moment that Defendant distinguished the $200,000.00 from the remainder of the proceeds by claiming its right to retain that portion of the money for the purposes of avoiding tax liability. When considered from a practical perspective, if Plaintiffs were to recover under both claims, they would in effect be paid twice. *See AD Rendon Comms., Inc. v. Lumina Ams., Inc.*, No. 04-CV-8832 (KMK), 2007 WL 2962591, at *5 (S.D.N.Y. Oct. 10, 2007) (dismissing conversion claim where plaintiff's breach of contract and conversion claim were both grounded in allegations that Defendant "acted wrongly by withholding and accepting . . . monies that contractually belonged to plaintiff"). Plaintiffs' statement of damages in the parties' proposed joint pre-trial order is telling: "$200,000, as *the amount of sale proceeds from the transaction that* [*Defendant*] *continues to withhold from*" Plaintiffs. (DE 74 at 25 (emphasis added).) In short, Plaintiffs seek through their conversion claim precisely what they seek through their breach of contract claim—the sale proceeds from the botched 1031 Exchange. *Compare Stanley Works Israel Ltd.*, 332 F. Supp. 3d at 514.

Accordingly, the undersigned respectfully recommends that Defendant's motion for summary judgment seeking dismissal of Plaintiffs' conversion claim be granted.

## IV. **CONCLUSION**

In sum, the undersigned respectfully recommends that (1) Defendant's motion for summary judgment as to Plaintiffs' breach of contract claim be denied; (2) Defendant's motion for summary judgment as to Plaintiffs' negligence claim be granted regarding Defendant's pre-contractual duties and denied regarding Defendant's filing of the Form 8288 and the filing of associated taxes; and (3) Defendant's motion to summary judgment as to Plaintiffs' conversion claim be granted.

## V. **OBJECTIONS**

A copy of this Report and Recommendation is being electronically served on counsel. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).

Dated: Central Islip, New York
December 2, 2021

/s/ *James M. Wicks*

JAMES M. WICKS
United States Magistrate Judge